[Cite as *State v. Hoskins*, 2013-Ohio-3580.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2013-02-013 |
| | : | O P I N I O N |
| - vs - | | 8/19/2013 |
| | : | |
| JACOB HOSKINS, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 12CR28589

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

William F. Oswall, Jr., 810 Sycamore Street, 5th Floor, Cincinnati, Ohio 45202, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Jacob Hoskins, appeals his conviction in the Warren County Court of Common Pleas for robbery. For the reasons discussed below, we affirm appellant's conviction.

{¶ 2} On October 1, 2012, appellant was indicted on one count of robbery in violation of R.C. 2911.02(A)(3) and one count of theft in violation of R.C. 2913.02(A)(1). The charges

arose out of allegations that on July 29, 2012, appellant stole a Sony surround sound system from a Walmart store located in Middletown, Warren County Ohio, and, in fleeing immediately after committing this theft, used force against a store employee.

{¶ 3} A bench trial was held in December 2012. At trial, the state presented the testimony of Barbara Arnold and Tyler Reamy, two asset protection employees for Walmart, and Officer David Creech of the Middletown Police Department. Arnold testified that she has worked as an asset protection officer for Walmart for four years and that her primary responsibility is to prevent shoplifting. Arnold explained that Walmart uses a video surveillance system called "March," which records 24 hours a day, and that this system was in operation on July 29, 2012.

{¶ 4} Arnold stated that she had been at work on July 29, 2012 when she received a phone call from an employee at another Walmart store who warned her that two individuals had been overheard planning to steal a Sony surround sound system from the Middletown location. Arnold testified that in response to this phone call, she and her partner, Reamy, walked back to the electronics department where they found appellant looking at a Sony surround sound system. Arnold observed appellant placing the sound system in his shopping cart and then leaving the electronics department. Arnold testified that she trailed appellant, following him into the grocery department where he selected a gallon of milk and a frozen pizza. Appellant then pushed his shopping cart to the front of the store, where Arnold watched appellant take his pizza and milk to a check-out line while leaving his cart, with the sound system in it, in an empty check-out line. After appellant purchased his milk and pizza, Arnold observed appellant walk back to the cart containing the sound system, place his purchased items in the cart, and push the cart past all points of sale and into the store's vestibule, which is located near the store's entrance and exit point.

{¶ 5} Arnold testified that once appellant pushed the sound system into the vestibule,

she and Reamy confronted appellant by getting in front of appellant's shopping cart, introducing themselves, and telling appellant that they needed to talk to him about the sound system. Arnold stated that appellant became "real shaky [and] real nervous," but did not say anything. Arnold told appellant he needed to accompany her and Reamy to their office, which was located to the right of where they were standing in the vestibule, near the entrance to the store. The "March" video surveillance footage indicated that this confrontation took place at 2:53:24 p.m.

{¶ 6} According to Arnold, appellant "start[ed] to act like he was going to cooperate" and began walking towards the office, but he then "walked back" towards his shopping cart. Appellant then cooperated again by walking towards the loss prevention office. Arnold testified that at this time, appellant "decide[d] he [did not] want to cooperate at all, so he trie[d] to take off" by going around Arnold and Reamy, but Arnold was able to "push him up against the wall [while Reamy was] still holding him down." The "March" video surveillance footage depicted this event at 2:53:35 p.m.

{¶ 7} Arnold testified that Reamy was able to open the door to the loss prevention office, and appellant was escorted inside at 2:53:50 p.m. The shopping cart containing the sound system was left in the vestibule until another Walmart employee secured the item.

{¶ 8} Once inside the loss prevention office, Arnold instructed appellant to have a seat on a bench that was located along the right wall. Arnold stated that appellant initially sat down in a chair and was asked to move to the bench seat. Arnold testified that at 2:53:57 p.m., appellant stood up, turned quickly, and started to run towards the door but Arnold and Reamy were able to move in front of appellant and block his way. Appellant was again instructed to have a seat on the bench, and at 2:54:05 p.m., he complied with the instruction. Arnold explained she and Reamy began asking appellant questions and attempted to fill out the necessary paperwork to process appellant as a shoplifter. At this time, appellant gave

Arnold his name. At 2:55:25 p.m., appellant stood up from his seat. Arnold told appellant to return to his seat, and at 2:55:34 p.m., appellant again sat down. However, at 2:55:39 p.m., appellant stood up "in * * * a rush." Arnold testified that she placed her arms out in anticipation of appellant's next move, but at 2:55:40 p.m., appellant placed his hands on Arnold's arms and moved her out of his way. Arnold stated that as appellant made it by her, he came into contact with Reamy. At 2:55:41 p.m., appellant pushed past Reamy, causing Reamy to spin into a wall and scrape his arm on a dry erase board. Arnold stated that by 2:55:45 p.m., appellant had fled from the loss prevention office and the store.

{¶ 9} Arnold testified that Reamy followed appellant and observed appellant enter a blue Chevrolet Blazer. Reamy was able to get the Blazer's license plate number, and Arnold contacted the Middletown Police Department. Arnold explained that the Middletown police located appellant and were able to bring him back to Walmart later that day so that she and Reamy could identify him.

{¶ 10} Following Arnold's testimony, Reamy took the stand and testified about the theft of the sound system. Reamy's testimony corroborated Arnold's account of events, emphasizing that appellant was "uncooperative" when confronted. According to Reamy, appellant "kept trying to dart around us, kept looking around. There were multiple times when we had to tell him that he needs to go with us and then he tried to push past me on one side * * * and we had to use physical redirection to get him in our office."

{¶ 11} Reamy explained that once appellant was in the loss prevention office, appellant became very fidgety and "tried to go [for] the door again." Appellant eventually sat down and was questioned, but Reamy was unable to obtain any information from appellant other than appellant's name because appellant "kept standing up [and] interrupting." Reamy stated that just prior to fleeing the store, appellant "sat down and then quickly got up" and pushed past Arnold. Appellant then pushed Reamy up against the wall, causing Reamy to

scrape his arm on a dry erase board. Reamy stated that he followed appellant out into the store's parking lot and obtained the license plate number of the blue Blazer appellant drove off in. While Arnold called the police, Reamy retrieved the "March" video surveillance footage. Reamy testified that the video surveillance footage was turned over to the police to aid in their investigation.

{¶ 12} Officer Creech next took the stand, testifying that on July 29, 2012, he responded to the Middletown Walmart after receiving a dispatch about a shoplifter. At this time, Creech was given the video surveillance footage and was told appellant's name. Creech testified that appellant was later arrested and transported to the Walmart, where Arnold and Reamy identified appellant as the shoplifter.

{¶ 13} At the close of the state's evidence, the defense made a Crim.R. 29 motion for acquittal which the trial court denied. The defense then rested without calling any witnesses. Following closing arguments, the trial court found appellant guilty of both theft and robbery, which the court determined where allied offenses of similar import. The state elected to proceed to sentencing on the robbery offense, and on February 11, 2013, appellant was sentenced to three years of community control.

{¶ 14} Appellant timely appealed his conviction, raising as his sole assignment of error the following:

{¶ 15} THE EVIDENCE ADDUCED AT TRIAL IS INSUFFICIENT TO UPHOLD A CONVICTION OF ROBBERY THEREBY DENYING THE APPELLANT HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶ 16} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of

the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 17} Appellant was convicted of robbery in violation of R.C. 2911.02(A)(3), which provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense shall * * * [u]se or threaten the immediate use of force against another." "The Ohio Supreme Court, in an effort to define 'fleeing immediately' as found within R.C. 2911.02(A), defined 'flee' as 'to run away from, to try to escape, to hasten for safety, or to withdraw hastily,' and 'immediate' as 'occurring without delay.'" *State v. Whitaker*, 12th Dist. Butler No. CA2008-01-034, 2009-Ohio-926, ¶ 11, quoting *State v. Thomas*, 106 Ohio St.3d 133, 2005-Ohio-4106, ¶ 15. A determination of whether a person is "fleeing immediately" is "fact specific, as all determinations under [R.C. 2911.02(A)] must be." *Thomas* at ¶ 16.

{¶ 18} Appellant does not dispute that he committed a theft or that he used force in struggling to get past Reamy after committing the theft offense. Appellant does, however, challenge whether the state presented sufficient evidence demonstrating that he was "fleeing immediately" after committing a theft offense. Appellant argues there was a delay or lapse of time between his theft of the sound system and his act of fleeing. Specifically, appellant contends that the theft was completed, the property he stole was separately secured, and he was led to the loss prevention office prior to his flight from the store, which he claims demonstrates that his act of fleeing was not "immediate." In support of his argument,

appellant relies on *State v. Thomas*, 2005-Ohio-4106.

{¶ 19} In *Thomas*, the defendant left a grocery store with stolen merchandise, dropped it, and continued to walk away from the store by entering a nearby laundromat. *Id.* at ¶ 2. The defendant was then approached by a security guard from the grocery store who asked the defendant to return to the store, to which he agreed. *Id.* Nevertheless, as the defendant and security guard approached the grocery store, the defendant struck the security guard in the face and attempted to flee. *Id.* The Supreme Court, in reversing the defendant's robbery conviction, noted that there had been a lapse of time between the theft and the defendant's attempt to flee, so that the defendant's flight could not have been said to have immediately followed the theft. *Id.* at ¶ 16. However, the Supreme Court noted that under slightly different circumstances, the defendant's conduct could have elevated the offense from theft to robbery. *Id.* For example, "had [the defendant] struggled with [the security guard] in an attempt to flee immediately after [the defendant] left the store, or after he dropped the stolen goods, or after being forced by [the security guard] to return to the store, then an ensuing injury, attempt to injure, or threat to injure might justify elevation of the offense from theft to robbery." *Id.*

{¶ 20} Based on our review of the record, we find the facts of this case demonstrate a scenario under which the Supreme Court noted in *Thomas* could justify elevating the offense from theft to robbery. *See id.* In this case, there was no significant lapse of time or intervening act or event that occurred between the shoplifting incident, appellant's attempt to leave the scene, and his struggle with Reamy. The record indicates that appellant did not leave the store prior to engaging in a physical altercation with the Walmart employees. The surveillance footage, in combination with Arnold and Reamy's testimony, demonstrated that from the time appellant was confronted at 2:53:24 p.m. as he tried to leave the store with the sound system, he was uncooperative and focused on his flight from the store. The video

footage demonstrates appellant made numerous attempts to run out of the store, including an attempt at 2:53:35 p.m., which required "physical redirection" be employed by Reamy and Arnold to get appellant into the loss prevention office, and at 2:53:57 p.m., which required Arnold and Reamy to move in front of appellant to block his exit out of the loss prevention office. Appellant finally succeeded in fleeing from the store at 2:55:45 p.m., less than two and one-half minutes after he was detained. Under the specific facts of this case, we find that appellant's act of fleeing from Walmart occurred immediately after committing the theft offense as there was no delay between his first effort to leave the store, his struggle with Reamy, and his ultimate escape. At the time appellant used force against another, there was no question that he was trying to find a way to "flee immediately" as contemplated by R.C. 2911.02(A)(3).

{¶ 21} Furthermore, contrary to appellant's arguments, the fact that appellant no longer had the sound system with him at the time he struggled with Reamy while trying to flee was not fatal to the state's case as R.C. 2911.02(A)(3) plainly does not require that the force used be in furtherance of a purpose to deprive another of property. *See Thomas*, 2005-Ohio-4106 at ¶ 13; *State v. Johnson*, 10th Dist. Franklin No. 11 AP-717, 2012-Ohio-2325, ¶ 19.

{¶ 22} The present case is similar to *State v. Johnson*, in which the Tenth Appellate District upheld a defendant's conviction for robbery. *Id.* at ¶ 1. There, the defendant stole cigarettes from a Kroger store. *Id.* at ¶ 15. The defendant attempted to leave the store a few minutes after taking the cigarettes, but he then ran back into the store a minute later. *Id.* at ¶ 16. Approximately 11 minutes thereafter, the defendant got into a struggle with Kroger employees, knocking them down, before he was able to escape into the store's parking lot. *Id.* at ¶ 17 and 29. The defendant was later arrested and charged with robbery. *Id.* at ¶ 2. A jury convicted the defendant of robbery, and he appealed, arguing that his conviction was not supported by sufficient evidence because the state did not prove that his struggle with the

Kroger employees occurred as a result of his attempt to flee immediately after the theft. *Id.* at ¶ 11. The Tenth District upheld the defendant's conviction, finding that the defendant's case was distinguishable from *Thomas*:

> In distinguishing the present matter from *Thomas,* the record before us indicates that [the defendant] did not leave Kroger for any period of time prior to engaging in a physical altercation with Kroger employees. Instead, the video footage shows that at approximately 10:40 a.m., [the defendant] walked back over to the cigarette corral, took more cigarettes, attempted to leave the store and, approximately one minute later, ran back into the store after a failed attempt to flee from Kroger security. * * * Although some time elapsed between [the defendant's] first attempt to flee, his struggle with Kroger employees, and his ultimate escape, [the defendant] was clearly trying to find a way to immediately leave the store.

*Id.* at ¶ 18.

{¶ 23} Accordingly, in viewing the evidence in a light most favorable to the prosecution, we conclude that there is sufficient evidence to prove, beyond a reasonable doubt, that appellant was fleeing immediately after the theft of the sound system when he used force against Reamy in violation of R.C. 2911.02(A)(3). Appellant's sole assignment of error is, therefore, overruled.

{¶ 24} Judgment affirmed.

PIPER, J., concurs.

M. POWELL, J. dissents.

**M. POWELL, J., dissenting.**

{¶ 25} Robbery pursuant to R.C. 2911.02(A)(3) provides that "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [u]se or threaten the immediate use of force against another." "Force" is defined by R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means

- 9 -

upon or against a person or thing."

{¶ 26} Here the theft offense or attempted theft offense was complete when Reamy and Arnold detained appellant in the Walmart vestibule. No force had been used by appellant in the commission or attempt to commit the offense. Therefore, to constitute robbery, the use or threat to use force must have occurred in conjunction with fleeing immediately after the commission of the offense or attempt to commit the offense. That is, the flight and the use or threatened use of force must coincide immediately after the commission or attempted commission of the theft offense.

{¶ 27} The Ohio Supreme Court in *Thomas* defined to "flee" as "'[t]o run away from,' 'to try to escape,' '[t]o hasten for safety,' or '[t]o withdraw hastily.'" *Thomas*, 2005-Ohio-4106 at ¶ 15. The Supreme Court further defined "immediately" as "'[w]ith no person, thing, or distance, intervening in time, space, order, or succession,' or '[w]ithout any delay or lapse of time,'" and "immediate" as "'[o]ccurring without delay.'" *Id.*

{¶ 28} Although appellant was not cooperative and tried to walk away from Reamy and Arnold, he did not physically exert "any violence, compulsion or constraint" to flee until after he was placed in the loss prevention office. Prior to that time, Reamy and Arnold used some degree of compulsion and constraint to maintain control of appellant. But, the record indicates that the force used by the store employees was not in response to any force used by appellant. In fact, appellant repeatedly submitted to such force (i.e., when Reamy and Arnold pushed appellant into the vestibule corner while they unlocked the loss prevention office door, appellant did not struggle to get away; appellant entered the loss prevention office and sat in a chair on command; appellant re-seated himself from a chair to the bench in the loss prevention office as told; and when appellant arose from being seated on the bench, he was told to sit down and did so). Being uncooperative is not synonymous with the use of force.

{¶ 29} The coincidence of flight and force did not occur here until after appellant was taken to the loss prevention office and after he was seated on the bench the second time. While appellant's conduct prior to this time may be construed as an attempt at flight, it was not accompanied by force or threat of force until more than two minutes after the completion of the theft offense. Too much time and succession intervened. This does not satisfy the element of immediacy.

{¶ 30} With regard and respect for my colleagues in the majority, I dissent.