[Cite as *State v. Ford*, 2021-Ohio-3058.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

STATE OF OHIO

APPELLEE

V.

STEVEN FORD, JR.

APPELLANT

COURT OF APPEALS NO. {48}L-20-1054
{48}L-20-1112

TRIAL COURT NO.   CR0201902995
CR0201902836

**DECISION AND JUDGMENT**

Decided:  September 3, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**MAYLE, J.**

## I.  Introduction

{¶ 1} Following separate altercations with two former girlfriends—C.F. and

M.M.—the defendant-appellant, Steven Ford, Jr., was charged with multiple felonies in

two separate cases.  Those cases were tried jointly before a jury in the Lucas County

Court of Common Pleas. The jury convicted him of aggravated burglary with respect to C.F., and robbery and felonious assault with respect to M.M. For the following reasons, we affirm.

## II. Background

{¶ 2} The first victim, C.F., testified that she and Ford were in a relationship from 2014 until 2016 and have a four year-old daughter. By the summer of 2018, C.F. and Ford had very little contact, and when they did speak, it was "rocky." Ford was reportedly living in Southern Ohio to be near another woman, M.M., who is the victim in the second case.

{¶ 3} At approximately 7:00 am on July 30, 2018, Ford went to C.F.'s apartment, located on Airport Highway in Lucas County, to see their daughter. C.F. was "shocked" to see him and told Ford "to come back later" because she and her daughter were preparing to leave for work and school. When Ford returned, he played with their daughter and also "play[ed] his Play Station" and "just [hung] out." During the visit, C.F. and Ford "bicker[ed]" about parenting issues. C.F. told him that she did not appreciate him "just popping up" and that he "couldn't just be a dad when it is convenient for [him]." Eventually, C.F. asked Ford to leave, but he refused. Ford told her that he would leave when he was ready.

{¶ 4} To hurry him along, C.F. turned off the wifi to the apartment and changed the password because she assumed that "if he could not play his game he would leave." Ford became "pissed" and "finally left." But, as soon as C.F. had closed and locked the apartment door, Ford "kicked it back in." As C.F. described it,

2.

A piece of the door came flying at me and my daughter because we were standing there. He came in and [was] like, bitch, do you really want to do this right now? And he put both his hands around my neck. * * * It was really tight * * * on the back of my neck.

{¶ 5} The assault lasted "a couple of seconds, maybe five seconds," before C.F. was able to get him off of her. By that time, the two were outside the apartment in the hallway. C.F. reentered her apartment, but Ford followed her and "choked" her again. The two drifted back into the hallway yet again, before Ford finally "took off." C.F. called 911.

{¶ 6} Toledo Police Officer Dwight Daniel, Jr. was dispatched to C.F.'s apartment, and he observed that C.F. was in distress. C.F. reported that Ford had choked her, that she had fallen down on the floor, that he had "choked her again," and then fled the scene. Because the potential charges involved felonies, Officer Daniel contacted the detective bureau, and a warrant was issued for Ford's arrest.

{¶ 7} Pictures taken of C.F.'s apartment door showed a mangled handle and splintered wood. The door was so badly damaged that it could not be secured, and a new door had to be installed that night.

{¶ 8} After the July 30, 2018 assault, C.F had no contact with Ford until May of 2019 when he called to ask "what's my kid been up to?" Over the coming weeks, C.F. allowed Ford to visit with his daughter five or six times at a public place, but after that, he "disappeared."

3.

**{¶ 9}** At trial, Ford testified in his own defense. Ford admitted that C.F. asked him to leave the apartment that night, he kicked in her door, and he caused the damage depicted in the photos. But, Ford denied strangling C.F.

**{¶ 10}** The victim in the second case, M.M., did not testify. Without M.M.'s testimony, the state relied upon other evidence to build its case against Ford. First, the state played a 911 call, placed by M.M.'s neighbor at 7:21 p.m. on May 6, 2019. The neighbor reported that M.M. had just called him, asking that he contact the police because "she just got beat up by her boyfriend." The neighbor was calling from outside the apartment complex where he and M.M. each lived, on Collingwood Blvd. in Toledo. Later in the call, the neighbor reported that M.M. and Ford were in the hallway of the apartment complex, in full view, that the assault was continuing "right now," and that the police needed to "hurry." M.M. was reportedly "half naked" and "look[ed] pretty bad." Finally, the neighbor reported that the boyfriend, identified as "Steve," was leaving with a "T.V. in his hand" and was walking down Collingwood Blvd.

**{¶ 11}** Toledo Police Officer Michelle Sterling and her partner arrived at the scene at 7:39 p.m. At trial, Officer Sterling described M.M. as "crying" and "very shaken up" with "marks" on her neck and chest due to an "altercation in front of the child." The police interview of M.M. was recorded by a body camera attached to Officer Sterling's uniform, and the nearly eight-minute video was also played for the jury.

**{¶ 12}** During the video, M.M. identified Ford as her former boyfriend and father to her nine month-old daughter. M.M. told police that Ford was there to watch their

4.

daughter while she went to work. She reported that the two had argued "a lot lately" because Ford accused her of "talking" to someone else at work and because Ford "kept snooping around" for money. M.M. told police that she "want[ed] him to leave" but that he would not.

{¶ 13} The altercation turned violent when Ford began choking her. According to M.M., Ford "wouldn't let go" of her neck, to the point that she "couldn't breathe" and lost consciousness. M.M. thought she would die as her daughter watched from her pack'n'play. As a result of the attack, M.M reported that her face had "turned brown," that her shoulder "popped" out of its socket—which took "forever" to get "back in" and "hurt so bad." M.M. also reported that she had carpet burns "everywhere," from being dragged.

{¶ 14} At trial, Ford acknowledged he did not want to leave the apartment—even though M.M. wanted him to go. Ford said that the two had gotten into a "heated argument" that turned physical when M.M. hit him with a "little wrench * * * two or three times," and a "tussle" ensued, which led them to fall to the floor. Once they stood up, the "arguing [continued] outside the house." Ford testified that he then left the apartment to "diffuse the situation." Ford admitted that he took the television, but claimed that they co-owned that item. He specifically denied strangling M.M. or causing the marks on her neck, but acknowledged that what he "did" that day was "probably serious."

5.

## 1.  The charges against Ford

{¶ 15} With respect to C.F., Ford was indicted on a single count of aggravated burglary, in violation of R.C. 2911.11(A)(1) and (B), a felony of the first degree, in case No. CR2019-2836.

{¶ 16} With respect to M.M., Ford was indicted for committing the offense of robbery, in violation of R.C. 2911.02(A)(2) and (B), a felony in the first degree, and felonious assault, in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree, in case No. CR01902995.

{¶ 17} Following a two-day jury trial and guilty verdicts, Ford was convicted on all counts.  As to the aggravated burglary conviction, the trial court sentenced Ford to serve three years in prison.  It sentenced him to two years as to the robbery offense and an additional two years as to the felonious assault offense, to be served concurrently to one another, and concurrently to the three-year sentence ordered in the other case, for a total prison term of three years.

{¶ 18} Ford appealed and raises two assignments of error with respect to the aggravated burglary case, and five assignments of error with respect to the robbery and felonious assault case.  We consolidated the appeals and have renumbered the assignments of error as follows:

> I.  The evidence presented at trial was insufficient to support a conviction for aggravated burglary.

> II.  The Jury's finding of guilty for Aggravated Burglary was against the manifest weight of the evidence.

6.

III. It was a violation of Appellant's rights under the Confrontation Clause for the Trial Court to allow the body camera footage to be shown to the jury as [M.M.] was not present in Court and available for cross-examination.

IV. The body camera footage was hearsay and no exception or exclusion applies that would permit its admission as [M.M.] failed to appear for trial.

V. The Trial Court committed reversible error when it permitted the jail phone call to be played to the jury as the phone call was inadmissible hearsay due to [M.M.'s] failure to appear at trial and further committed reversible error in finding that [M.M.] failed to appear due to Appellant's wrongdoing.

VI. The evidence presented at trial was insufficient to support a conviction for Robbery and Felonious Assault.

VII. The Jury's finding of guilty for Robbery and Felonious Assault was against the manifest weight of the evidence. [1]

### III. Law and Analysis

**{¶ 19}** For ease of discussion, we address Ford's assignments of error out of order.

---

[1] We remind appellate counsel of 6th Dist.Loc.App.R. 10(C), pertaining to appellate briefs, which provides that "[v]ictims of criminal offenses *shall* be referred to by the victim's initials or generic term or abbreviation." (Emphasis added).

### 1. The victim's out-of-court statements were nontestimonial.

{¶ 20} In his third assignment of error, Ford argues that the trial court erred in allowing the jury to view Officer Sterling's body camera video, which contained M.M.'s statements to police after they responded to the 911 call. Ford argues that M.M.'s recorded comments were testimonial in nature and, therefore, M.M.'s out-of-court statements violated his Sixth Amendment right to confront the witness against him.

{¶ 21} The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless [she] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. "[T]he proper analysis for determining whether out-of-court statements violate the Confrontation Clause is * * * whether they are testimonial in nature." *Toledo v. Sailes*, 180 Ohio App.3d 56, 2008-Ohio-6400, 904 N.E.2d 543, ¶ 13 (6th Dist.), citing *Crawford* at 61. We conduct a de novo review of evidentiary rulings that implicate the Confrontation Clause. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

{¶ 22} Statements are nontestimonial when made "in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v.*

8.

*Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). By contrast, statements are testimonial when "the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution." *Id.* at 822; *Accord, State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028 (A statement will be said to be "testimonial" if "it is made with a primary purpose of creating an out-of-court substitute for trial testimony."). Whether an emergency exists and is ongoing "is a highly context-dependent inquiry." *Michigan v. Bryant,* 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

{¶ 23} Ford argues that, based on the evidence in the case, there was no ongoing emergency because he had already left the scene and therefore posed "no immediate[] threat" to M.M. Ford likens his case to *State v. Smith,* 1st Dist. Hamilton No. C-180499, 2019-Ohio-3257, where the court found that the victim's responses under police questioning were testimonial and therefore subject to the protections of the Confrontation Clause.

{¶ 24} In *Smith*, police questioned the victim *after* the defendant was already in custody and approximately two or more hours after the criminal offense had been committed. Here, the police arrived on the scene just minutes after the assault had occurred and while Ford's whereabouts were unknown. Moreover, in *White*, the court found that the police questioning did not focus on any "exigent threat or safety concern." Here, the questions the police asked M.M. indicate that their primary purpose was to

9.

enable the police to assess the extent of the emergency. As Officer Sterling testified at trial, when police found "a very shaken up" and "crying" M.M. at the scene, they asked M.M. if she had been "hit." They also asked a series of questions about her attacker including his name, his date of birth and social security number, where "would he go," whether he knew anyone in the area, whether he "had a key to get in here" and whether M.M. "could lock the door" after police had gone. Moreover, this questioning occurred at M.M.'s apartment, not police headquarters. *Ohio v. Clark*, 576 U.S. 237, 135 S.Ct. 2173, 192 L.E.2d 306 (2015) ("A formal station-house interrogation * * * is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused.").

{¶ 25} Although Ford claims that any "threat" posed by him subsided once he left, there was no way for the police or M.M. to know whether he would return—a fact that was made abundantly clear in the video when, after a sudden noise can be heard, Officer Sterling asked, "[n]obody's coming up the stairs are they?" and the camera pans to the apartment staircase.

{¶ 26} Finally, Ford complains that Officer Sterling's questions "about a loss of consciousness" were designed to assist the state in establishing a case of felonious assault. But, the context of the questions indicate a different purpose. In the video, M.M. declined medical attention because she needed to go to work. In response, Officer Sterling instructed M.M. "to be careful" in light of the assault and asked, "[d]id you pass out? Did you lose consciousness?" Thus, Officer Sterling was making sure that M.M. did not forego any necessary medical attention.

10.

{¶ 27} In sum, we find that the primary purpose of the dialogue between police and M.M., as captured by Officer Sterling's body cam video, was to assess the threat and to meet an ongoing emergency. Accordingly, M.M.'s statements were nontestimonial in nature and not subject to the Confrontation Clause. *Accord, State v. Tomlinson,* 8th Dist. Cuyahoga No. 109614, 2021-Ohio-1301, ¶ 43 (Finding body-camera statements were not testimonial because they were made to law enforcement in the course of responding to an emergency situation and because the victims "had just been shot at and called the police to seek protection and medical treatment.").

{¶ 28} Ford's third assignment of error is found not well-taken.

### 2. M.M.'s out-of-court statements were admissible pursuant to hearsay exceptions.

{¶ 29} In his fourth assignment of error, Ford argues that even if M.M.'s out-of-court statements were nontestimonial, they were inadmissible hearsay and therefore should not have been admitted through the body camera video.

{¶ 30} Given that M.M.'s out-of-court statements were nontestimonial, they were admissible only if they were not hearsay or subject to "an applicable exception to the normal hearsay rule." *State v. Reardon,* 168 Ohio App.3d 386, 2006-Ohio-398, 4860 N.E.2d 141, ¶ 15 (6th Dist.). "On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings" because "[w]hile there is discretion to admit or exclude relevant evidence, there is no 'discretion' to admit hearsay." *State v. Richcreek*, 196 Ohio App.

11.

3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 32 (6th Dist.) quoting *State v. Sutorius*, 122 Ohio App.3d 1, 7, 701 N.E.2d 1 (1st Dist.1997), and *State v. Sorrels*, 71 Ohio App.3d 162, 165, 593 N.E.2d 313 (1st Dist.1991).

{¶ 31} In this case, the trial court found that M.M.'s recorded statements to police were admissible under two separate exceptions to the hearsay rule: forfeiture by wrongdoing under Evid. R. 804(B)(6), and excited utterance under Evid. R. 803(2). We agree.

{¶ 32} Under Evid.R. 804(B)(6), a statement offered against a party is not excluded by the hearsay rule "if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." To qualify for this exception, the state must show by a preponderance of the evidence that (1) the defendant's wrongdoing resulted in the witness's unavailability; and (2) "one purpose was to cause the witness to be unavailable at trial." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84.

{¶ 33} Before trial, the state filed its notice of intent to use M.M.'s out-of-court statements under Evid.R. 804(B)(6). It claimed that Ford, while incarcerated and awaiting trial, contacted M.M. by phone and instructed her not to testify. During the ten-minute phone call between Ford and M.M., this brief exchange took place:

> Ford: Just don't appear in court cuz they gonna be calling for you.
>
> M.M.: So, I can't go?
>
> Ford: No man. Don't appear in court when they call for you. * * *

Cuz your case on my shit too. * * *

The state further alleged that its efforts to reach M.M. before trial were unsuccessful, and that it anticipated she would not appear at trial, despite being subpoenaed. The state argued that M.M. was acting under Ford's directive not to testify.

{¶ 34} On appeal, Ford argues that the trial court erred in "casting [his] comments" as a "threat, let alone a 'subtle' threat." Ford argues that the "wrongdoing" required by Evid.R. 804(B)(6) requires a showing of harm or a threat of physical harm. To the contrary, Evid.R. 804(B)(6) "covers a variety of wrongdoing beyond the murder or physical assault of the declarant." *State v. Harper*, 6th Dist. Lucas No. L-15-1310, 2017-Ohio-1395, ¶ 30. In *Harper,* we found that the state demonstrated that the victim's unavailability was due to appellant's wrongdoing and was designed to prevent her from testifying where there was evidence of the defendant "pleading with 'C' to convince the victim not to appear at trial." *Id.* The staff notes to Evid.R. 804(B)(6) also make clear that, "the wrongdoing need not consist of a criminal act." Thus, "[e]ncouraging a witness to leave the state is wrongdoing * * * because no one has the legal right to refuse to provide testimony in the absence of a privilege or other rule of evidence." *Id*

{¶ 35} Given the substance of the phone call between Ford and M.M., we find that the state satisfied its burden to show by a preponderance of the evidence that M.M.'s failure to appear in court was due to Ford's wrongdoing, and that Ford's conduct was designed, at least in part, to prevent her from testifying. Accordingly, M.M.'s statements were admissible under Evid.R. 804(B)(6).

13.

{¶ 36} In addition, M.M.'s comments were excited utterances under Evid.R. 803(2). A statement which is otherwise considered hearsay may be admissible as an excited utterance when the following four criteria are met: "(1) a startling event, (2) a statement relating to that event, (3) a statement made by a declarant with firsthand knowledge, and (4) a statement made while the declarant was under the stress of the excitement caused by the event." *State v. Dean,* 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 123. An excited utterance is not excluded by the hearsay rule "regardless of whether the declarant is available as a witness." Evid.R. 803.

{¶ 37} Here, M.M. had experienced a startling event (i.e. being strangled, dragged and robbed by Ford); her comments to the police related to that event; she had first-hand knowledge of the startling event; and she remained under the stress of the excitement throughout the entire interaction with the police, without time for thought or reflection. Under such circumstances, the statements have the requisite degree of trustworthiness to qualify as excited utterances. *State v. Taylor,* 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993) (An excited utterance is considered "more trustworthy" than other hearsay because the startling event "renders the declarant incapable of fabrication" and because the impression on the declarant's memory "is still fresh and intense.").

{¶ 38} For these reasons, we find that the trial court did not err in admitting the body camera footage, and Ford's fourth assignment of error is found not well-taken.

### 3. The phone call between Ford and M.M. was admissible.

{¶ 39} In his fifth assignment of error, Ford claims that the trial court erred in admitting the recorded phone call because "the State failed to show that Appellant

14.

committed any wrongdoing in his conversation with [M.M.]" His argument is based upon the incorrect assumption that the phone call was admitted under the forfeiture-by-wrongdoing hearsay exception of Evid.R. 804(B)(6). Although M.M.'s recorded statements to police were admitted under Evid. R. 804(B)(6), there was no discussion regarding which evidentiary rule applied to Ford's recorded statements to M.M. during the jail-house phone call. This is likely because Ford did not object to the admission of the phone call —in fact, Ford asked the trial court to play the entire phone call for the jury (rather than just the excerpt relating to M.M.'s testimony in court).

{¶ 40} Thus, to the extent there was any error here, it was invited error and Ford "will not be permitted to take advantage of an error which he himself invited or induced.'" *State v. Bey,* 85 Ohio St.3d 487, 493, 709 N.E.2d 484 (1999). *See, e.g., State v. Roulette*, 4th Dist. Scioto No. 10CA3364, 2011-Ohio-6993, ¶ 14 (Defendant precluded from challenging admissibility of a photograph shown to the jury after trial court consulted with him before allowing jury to see it). Regardless, Ford's statements were properly admissible under Evid.R. 801(D)(2)(a) as statements against interest. *State v. Pryor*, 5th Dist. Stark No. No. 2013CA00016, 2013-Ohio-5693, ¶ 32.

{¶ 41} For these reasons, Ford's fifth assignment of error is found not well-taken.

### 4. There was sufficient evidence to support the aggravated burglary conviction, and it was not against the manifest weight of the evidence.

{¶ 42} Ford's remaining assignments of error challenge the legal sufficiency and weight of the evidence supporting his convictions for aggravated burglary, robbery, and

15.

felonious assault. We will begin by discussing his aggravated burglary conviction—in the case involving C.F.—which is the subject of his first and second assignments of error.

{¶ 43} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1981), paragraph two of the syllabus.

{¶ 44} R.C. 2911.11, the aggravated-burglary statute, provides as follows:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another; * * *

(B) Whoever violates this section is guilty of aggravated burglary, a felony of the first degree. R.C. 2911.11(A)(1) and (B).

{¶ 45} In his first assignment of error, Ford argues that his aggravated burglary conviction should be vacated because the state failed to produce sufficient "proof of injuries to [C.F.]."

16.

{¶ 46} To begin, R.C. 2911.11(A)(1) does not require *actual* physical harm—that is, an attempt or threat to inflict physical harm is sufficient to sustain a conviction for aggravated burglary. *Accord, State v. Spears,* 3d Dist. Crawford No. 3-07-32, 2008-Ohio-2408, ¶ 19; *State v. Dobbins,* 8th Dist. Cuyahoga No. 84155, 2004-Ohio-5738, ¶ 13-14. Here, the state presented evidence that Ford "put both his hands * * * on the back of [C.F.'s] neck" in a "really tight" manner that lasted "maybe five seconds," and then "choked" her a second time before fleeing. Based on this testimony, the jury could infer that Ford *attempted* to physically harm C.F., which is sufficient to sustain his conviction for aggravated burglary. *Accord Spears* at ¶ 20 (Jury could infer that defendant attempted to physically harm victim where evidence established that he "shoved or pushed [the victim] more than three different times.").

{¶ 47} Regardless, the record contains sufficient evidence that C.F. suffered *actual* physical harm as well. "When there is no tangible, physical injury such as a bruise or cut, it becomes the province of the [trier of fact] to determine whether, under the circumstances, the victim was physically injured, after reviewing all of the evidence surrounding the event." (Quotation omitted.) *State v. Collier,* 9th Dist. Lorain No. 07CA009115, 2008-Ohio-826, ¶ 14. As used in the relevant statute, "'[p]hysical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). Here, C.F. testified that, as a result of the assault, she experienced headaches, her neck was "sore to the touch," and her nose was bruised. *See State v. Adams,* 12th Dist. Butler No. CA2006-07-160, 2007-Ohio-2583, ¶

17.

50 (Victim's description of having a "sore face" and "kind of like a bruised feeling" establishes "physical harm" under R.C. 2901.01(A)(3)); *State v. Reese,* 8th Dist. Cuyahoga No. 85902, 2005-Ohio-5724, ¶ 12 ("Bruising constitutes 'physical harm'"). We find this is sufficient evidence of physical harm.

{¶ 48} Accordingly, we find Ford's first assignment of error not well taken.

{¶ 49} In his second assignment of error, Ford claims that his aggravated burglary conviction is against the manifest weight of the evidence.

{¶ 50} When reviewing a claim that a verdict is against the manifest weight of the evidence, we do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L–10–1369, 2012–Ohio–6068, ¶ 15 quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins at* 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 51} Here, Ford argues that the aggravated burglary conviction is against the manifest weight of the evidence because the record does not contain any photographs of C.F.'s physical injuries. We find that the lack of photographic evidence of C.F.'s physical injuries does not diminish or discredit C.F.'s testimony, and the totality of the evidence does not weigh heavily against conviction.

{¶ 52} Accordingly, we find Ford's second assignment of error not well taken.

18.

**5. The robbery and felonious assault convictions are supported by sufficient evidence and are not against the manifest weight of the evidence.**

{¶ 53} Ford also challenges his robbery and felonious assault convictions in the case involving the other victim, M.M. In his sixth assignment of error, he argues these convictions are not supported by sufficient evidence. In his seventh assignment of error, he argues that these convictions are against the manifest weight of the evidence.

{¶ 54} We begin with the robbery conviction. R.C. 2911.02(A)(2) provides that, "(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another."

{¶ 55} On the body camera video, M.M. tells police that "he took my T.V." Ford argues that if the body camera footage was inadmissible, then the record would contain no admissible evidence that he committed a theft offense. A sufficiency review, however, considers *all* of the evidence at trial—whether admissible or not. *State v. Brewer,* 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 16-20, citing *Lockhart v. Nelson,* 488 U.S. 33, 35, 38, 40-42, 109 S.Ct. 284, 102 L.Ed.2d 265 (1988). Regardless, we have already concluded that the body camera video was properly admitted at trial. M.M.'s statement that she owned the T.V. was sufficient to establish a theft offense.

{¶ 56} Ford also claims that the state failed to show that Ford caused M.M. physical harm "in order to help him commit a theft." But, "[t]he [robbery] statute plainly does not require that the force attendant to the theft offense be inflicted in furtherance of a purpose to deprive another of property." (Quotation omitted.) *State v. Thomas,* 106

19.

Ohio St.3d 133, 2005-Ohio-4106, 832 N.E.2d 1190, ¶ 13. Thus, it was not necessary that Ford have inflicted physical harm against M.M. in order to obtain possession of the T.V. The state need only have shown that there was "no significant lapse of time or intervening act or event that occurred between" Ford's theft and his infliction of physical harm. *State v. Hoskins,* 12th Dist. Warren No. 2013-Ohio-3580, ¶ 20. Here, the evidence established that Ford fled from the apartment complex immediately after the assault, with the T.V. in hand.

{¶ 57} Viewing the foregoing evidence in a light most favorable to the prosecution, we find sufficient evidence to support the robbery conviction.

{¶ 58} Ford also argues that the robbery conviction was against the manifest weight of the evidence because the jury should have deemed his testimony—that the T.V. belonged to "both of [them]"— credible. Although under a manifest weight standard we consider the credibility of witnesses, we extend special deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L–10–1162, 2012–Ohio–616, ¶ 14. Here, the jury found M.M.'s excited utterance to the police ("he took my T.V.") to be more credible than Ford's testimony at trial, and we see no reason to undo the jury's credibility determination.

{¶ 59} Accordingly, we find that Ford's robbery conviction is not against the manifest weight of the evidence.

20.

{¶ 60} Ford also argues that his conviction for felonious assault against M.M. was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.

{¶ 61} Under the felonious-assault statute, R.C. 2903.11(A)(1), "[n]o person shall knowingly * * * cause serious physical harm to another * * *."  Here, Ford argues that the state met its burden of proving "serious" harm to M.M. through the body camera video, which should have been excluded.  According to Ford, without the body camera video, there was no admissible evidence that Ford caused serious physical harm to M.M. Again, we consider all the evidence—not just properly-admitted evidence—in a sufficiency review.  *Brewer,* 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284 at ¶ 16-20.  Regardless, as discussed, the body camera video was properly admissible.  On that video, M.M. told police that Ford choked her to the point of unconsciousness— which is "serious physical harm" under the statute.  *State v. Thomas*, 6th Dist. Lucas No. L-17-1266, 2019-Ohio-1916, ¶ 58, *appeal not allowed*, 156 Ohio St.3d 1487, 2019-Ohio-3331, 129 N.E.3d 457, and *appeal not allowed*, 2020-Ohio-2819, ¶ 58-59, 158 Ohio St.3d 1506, 144 N.E.3d 447 (Citing cases).

{¶ 62} Accordingly, we find that the Ford's conviction for felonious assault is supported by sufficient evidence.

{¶ 63} Finally, Ford argues that his conviction for felonious assault is against the manifest weight of the evidence because Ford "testified there was mutual combat, which started when M.M. hit him with a tool" and he "attempted to defend himself."  We reject

21.

Ford's attempt to argue self-defense for the first time on appeal. Ford did not request a self-defense jury instruction at trial. Instead, Ford requested and was granted an instruction for aggravated assault, which is appropriate where the defendant presents sufficient evidence of serious provocation. *State v. Deem,* 40 Ohio St.3d 205, 211, 533 N.E.2d 294 (1988). An aggravated-assault instruction and a self-defense instruction are considered inconsistent defenses, and courts are reluctant to give both in a prosecution for felonious assault. *State v. Smith,* 168 Ohio App.3d 141, 2006-Ohio-3720, 858 N.E.2d 1222 (1st Dist.).

{¶ 64} The jury rejected Ford's testimony that M.M. provoked him—by hitting him with a wrench—into acting in a sudden passion or fit of rage. Once again, we see no reason to overturn the jury's credibility determinations. Like the jury, we find M.M.'s statements to police to be more credible than Ford's testimony at trial. Accordingly, we find the felonious assault conviction was not against the weight of the evidence.

{¶ 65} In sum, because Ford's convictions for robbery and felonious assault are supported by legally sufficient evidence, we find his sixth assignment of error not well-taken. And, because Ford's convictions for robbery and felonious assault are not against the manifest weight of the evidence, we find his seventh assignment of error not well-taken.

### III. Conclusion

{¶ 66} For all the foregoing reasons, we find Ford's assignments of error not well-taken. The February 10, 2020 judgments of the trial court, in case No. CR2019-2836 and

22.

case No. CR2019-2995, are affirmed.  Ford is ordered to pay the costs of this appeal

pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
See, also, 6th Dist.Loc.App.R. 4.

| | |
|---|---|
| Thomas J. Osowik, J. | [[Applied Signature]] |
| | JUDGE |
| Christine E. Mayle, J. | [[Applied Signature 2]] |
| | JUDGE |
| Myron C. Duhart, J. | [[Applied Signature 3]] |
| CONCUR | JUDGE |