[Cite as *State v. Stevenson*, 2023-Ohio-4853.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No.  WD-22-067

    Appellee                              Trial Court No.  2021CR0439

v.

John Edward Stevenson                    **DECISION AND JUDGMENT**

    Appellant                             Decided:  December 29, 2023

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

W. Alex Smith, for appellant.

* * * * *

**ZMUDA, J.**

**{¶ 1}** Appellant, John E. Stevenson, appeals the August 18, 2022 judgment of the

Wood County Court of Common Pleas finding him guilty of robbery.  We find

appellant's assignment of error not well-taken and affirm the judgment of the trial court.

## I. Introduction

{¶ 2} On September 2, 2021, appellant was indicted on one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and (C), a first-degree felony. Shortly before trial, the trial court granted the state's motion to amend the indictment to robbery in violation of R.C. 2911.02(A)(2) and (B), a second-degree felony. Following a jury trial, appellant was convicted. Appellant now appeals.

## II. Assignment of Error

Appellant filed a timely notice of appeal asserting the following assignment of error:

{¶ 3} The trial court erred by denying Stevenson's motion in limine and allowing impermissible hearsay at trial in violation of the Confrontation Clause of the 6th Amendment.

## III. Procedural and Factual Background

{¶ 4} The charge in this case stemmed from a September 21, 2020 incident in which a group of out-of-state construction workers claimed they were robbed in their hotel room at the America's Best Value Inn and Suites in Northwood, Ohio. That night, Northwood Police Officer Aaron Hunt responded to a 911 call reporting the hotel robbery that was made from a gas station next to the hotel. Throughout the course of the night, Officer Hunt, who was wearing a body-worn camera ("body cam"), spoke with several of the construction workers who said that they had been robbed by two armed assailants in room 149 of the hotel.

2.

{¶ 5} The police took months to identify appellant as one of the assailants, and by the time appellant's trial took place, the victims were no longer in the area and could not be reached to testify. Over appellant's objection, the state played video from Officer Hunt's body cam of his conversations with the victims and several witnesses on the night of the incident.

{¶ 6} The issue on appeal is whether the trial court committed reversible error in admitting portions of Officer Hunt's body cam video and permitting a police detective to testify regarding how she was able to identify appellant as a suspect. Before trial, appellant filed a motion in limine seeking to exclude the body cam video. Therefore, we begin with the pretrial evidentiary issue before summarizing the trial proceedings.

## A. Pretrial Proceedings

{¶ 7} On May 9, 2022, appellant filed a motion in limine seeking the exclusion from trial any statements made by any person not testifying at trial, and specifically body cam video footage.[1] The appellant argued the victims' statements to Officer Hunt on the body cam video were inadmissible hearsay, the admission of which would violate the Confrontation Clause of the Constitution, because the victims would not be testifying at trial.

---

[1] The state presented body cam video from two officers, Officer Hunt and Officer Migliori. The trial court ruled that the entirety of Officer Migliori's body cam video was inadmissible, and neither party appealed the trial court's ruling.

3.

**{¶ 8}** In considering the motion, the trial court split Officer Hunt's body cam video into five segments, determining the admissibility of each segment separately. Each segment of the body cam video footage is described below.

***Body Cam Video at Gas Station, Time Stamp 00:00 - 03:47***

**{¶ 9}** Upon arrival at the gas station, approximately 15 minutes after the incident at issue, Officer Hunt found R.M. just outside of the gas station with a gas station employee. R.M. told Officer Hunt that he had called 911. Officer Hunt observed that R.M. was not wearing any shoes and appeared scared, anxious, and fearful. Speaking rapidly, R.M. reported that he and his friends were staying at the America's Best Value Inn and Suites next door while they were in town working on a local construction project. Two guys approached R.M. and his friend, E.F., and demanded to be let into room 149, where friends of R.M. were staying. The two guys, whom R.M. described as a white guy and a black guy, threatened to kill R.M. and his friend. Officer Hunt asked if R.M. knew the two men, and R.M. said he did not.

**{¶ 10}** R.M. said that the two men pushed R.M. and E.F. into the room. The two men demanded money, and one of them gestured toward a weapon in the waistband of his pants. R.M. said the weapon was a knife and the man was acting like the knife was a gun. According to R.M., the men took a gaming system and other things, though R.M. did not specify what those items were.

4.

{¶ 11} R.M. said he barely managed to escape the room, leaving his phone and shoes behind, and was afraid for his life. He ran to call 911. One of the two men standing with R.M. outside the gas station stated that he had given R.M. a phone to call the police and confirmed that R.M. had just gotten to the gas station.

{¶ 12} Because R.M. fled the room while the events were still in progress minutes before, R.M. told Officer Hunt that he was not sure whether the two guys were still in the room. R.M. and the gas station employee said that they had not seen the two guys leave the hotel while they had been standing outside the gas station. R.M. said that E.F. was still in the room.

*Body Cam Video at Police Car and Hotel Parking Lot, Time Stamp 03:48-06:54*

{¶ 13} Officer Hunt then returned to his vehicle where he spoke to another police officer. He also radioed into dispatch information about the incident. Officer Hunt and the second officer then walked through the hotel parking lot toward the hotel, and while doing so they talked to each other about R.M.'s apparent mental state and the incident.

*Initial Body Cam Video at Hotel, Time Stamp 06:55-9:40*

{¶ 14} Officer Hunt and two other police officers walked into the hotel with R.M. following behind. The police officers cautiously approached room number 149. R.M. remained at the end of the hotel hallway, several feet away. Officer Hunt knocked on the door of room 149, and when there was no response, Officer Hunt knocked again, this time identifying himself as the police.

5.

*Body Cam Video at Hotel with Victim Conversations, Time Stamp 09:41-22:52*

{¶ 15} Three individuals, E.F., E..E., and J.L., came out of room 149 into the hallway. Officer Hunt asked if just the three of them had been in the room, and they said yes. Officer Hunt then called to R.M., who was still at the end of the hallway, to come join them. When R.M. saw E.F., E.E., and J.L., he expressed surprise that they came out of the room, asking if they had been there. When they said they had been there, R.M. asked them, "And you stayed quiet?" J.L. and E.F. explained that J.L. returned to room 149 after the incident occurred.

{¶ 16} Officer Hunt asked all three individuals what was going on. One of them, E.F., said that two guys had R.M. and him in the room and the guys tried to take money from them. J.L. said that he had not been involved because he had gone out to his truck before the incident occurred. Officer Hunt asked when the incident happened, and E.F. said about 15 minutes earlier. When Officer Hunt asked where the assailants went, J.L. and E.F. said the assailants had been all around the hotel, walking back and forth. J.L. said that when he was outside, he had seen two guys running around but did not think anything of it.

{¶ 17} Officer Hunt then reviewed the sequence of the events. He began by asking who had been in room 149 at the time of the incident, and the individuals stated that only E.F. and R.M. had been in the room. Officer Hunt confirmed that R.M. had taken off running from the room, then asked if the assailants had a gun. E.F. reported

6.

that he had seen an assailant with a black gun, but the assailant did not point the gun at him.

{¶ 18} When Officer Hunt asked whether the assailants had taken anything, three of them—E.E., E.F., and J.L.—reported that their iPhones had been taken. E.F. also said that a speaker had been taken but not any money. Officer Hunt asked R.M. if the assailants had taken anything from him, and R.M. said they had not. R.M. also said that the assailants had not pointed a gun at him, and the weapon had stayed in one assailant's waistband. Officer Hunt asked if the victims had seen the assailants around before the incident, and the victims said they had not.

{¶ 19} Officer Hunt then asked for the names of each of the three individuals, copying down details from some of the victims' Texas drivers' licenses, which he radioed in to dispatch. He also for details about each stolen phone, writing down the model and phone number for each of them.

{¶ 20} Officer Hunt returned to questioning R.M., going over the events with him again. Officer Hunt asked R.M. whether the assailants had tried to get R.M. into the room, and R.M. and E.F. corrected him, explaining that the assailants had gotten R.M. into the room. Officer Hunt then asked R.M. to explain how he had escaped. Officer Hunt then confirmed that R.M. came out the door of 149 and the direction in which R.M. ran.

7.

{¶ 21} Officer Hunt next directed his attention to two other individuals who were standing outside the door of a neighboring room, asking them if they had been involved. The two individuals denied any involvement, but one said that he had seen the assailants in the hallway. Officer Hunt asked the witness for descriptions of the assailants and their clothing, and Officer Hunt radioed the descriptions into dispatch.

{¶ 22} After that, Officer Hunt asked E.F. for his description of the assailants. E.F. provided more details about the assailants' body size and clothing, and Officer Hunt radioed that information into dispatch as well. Officer Hunt asked if the assailants had taken anything else, and E.F. said they had taken a speaker. Officer Hunt asked for the type of speaker, and E.F. gave the brand, color, and size, which Officer Hunt wrote down.

{¶ 23} Throughout the video, many of the victims and witnesses were speaking Spanish to each other, with some serving as translators for Officer Hunt. As the witnesses and victims spoke, they appeared to occasionally joke with each other, laughing at times.

***Body Cam Video at Hotel of Police Investigation, Time Stamp 22:53-end***

{¶ 24} The video continued for a significant period of time as Officer Hunt interviewed the victims' friends and other individuals present in the hotel. Officer Hunt instructed the victims to use the Find My iPhone feature to locate their phones, walked around the hotel with the victims, spoke with other police officers about the case, and reviewed hotel surveillance video, among other things. J.L. discovered his cell phone

8.

had not been stolen and it had just been in a different hotel room, and the victims also mentioned that their game system had been stolen in this segment of the video.

{¶ 25} Officer Hunt also learned that the assailants had unsuccessfully tried to get into room 149 earlier that night. E.E., whose statements were translated from Spanish to English by E.F., said that the assailants had knocked on the door of room 149 earlier, and when E.E. answered the door, one of the assailants punched E.E, cutting E.E.'s lip.

### *The Parties' Arguments*

{¶ 26} Appellant argued that the admission of the entire body cam video would violate the Confrontation Clause because the video contained testimonial statements made during the course of a police investigation and not during an ongoing emergency. Appellant contended that the assailants had already left the hotel when the videos were recorded, so an emergency no longer existed and Officer Hunt's conversations were an investigation of a crime that had occurred in the past. Appellant further argued that the video contained inadmissible hearsay statement that did not qualify as either present-sense impressions or excited utterances because the events had already taken place and the victims were calm at the time the videos were recorded. Finally, appellant argued that the body cam videos violated Evid. R. 403 in that they were more prejudicial than probative. Appellant pointed to the victims speaking Spanish throughout the portion of the video in the hotel, claiming that because appellant's counsel could not speak Spanish, the admission of the video was prejudicial.

9.

{¶ 27} The state contended that the Confrontation Clause was not implicated because the statements were nontestimonial statements made during an ongoing emergency. The state argued that R.M. had just fled from the hotel room and the location of the armed assailants was unknown throughout the time the video was recorded. Further, the state pointed out that R.M. was shoeless, having just fled from the hotel, and clearly agitated throughout his conversation with Officer Hunt, which occurred shortly after the events at the hotel took place. Neither R.M. nor Officer Hunt knew whether the perpetrators were still in the hotel room or R.M.'s coworkers were still in danger. The state likewise argued that the portion of the body cam video recorded in the hotel was shortly after the robbery had occurred and the two assailants, who were armed, were still unidentified and at large.

{¶ 28} The state argued that the victims' statements fell under three hearsay exceptions: present sense impression under Evid. R. 803(1), excited utterance under Evid.R. 803(2), and records of regularly conducted activity under Evid.R. 803(6). The state asserted that the statements were the victims' perception of a violent event that had just occurred, so they were present sense impressions. Similarly, the state contended that the statements were excited utterances because they were made immediately following a traumatic event, and R.M. in particular was still experiencing the excitement of that event. Finally, the state argued that the body cam videos were records of regularly

10.

conducted activity because the videos were recorded during the regularly conducted business activity of the Northwood Police.

### *The Trial Court's Ruling*

{¶ 29} The trial court held that certain portions of the video contained inadmissible hearsay. The trial court ordered that the Body Cam Video at Police Car and Hotel Parking Lot, Time Stamp 03:48-06:54 and Body Cam Video at Hotel of Police Investigation, Time Stamp 22:53-end could not be shown at trial. However, the trial court held that the remaining three portions of the video were admissible. The court reasoned that they contained non-testimonial statements made in the course of an ongoing emergency, and they fell under the excited utterance or present sense impression exceptions to the rule against hearsay set forth in Evid.R. 803(1) and 803(2).

### B. Trial Proceedings

{¶ 30} At trial, the state presented the testimony of Officer Hunt, Adelina Cardenas, Detective Barrett, and Officer Christopher Buck. Their testimony is as follows:

### *Officer Hunt's Testimony*

{¶ 31} Officer Hunt testified regarding his observations on the night of September 21, 2020 in conjunction with the admitted portions of his body cam footage from that night. First, Officer Hunt testified that upon arrival at the gas station, he observed R.M. as appearing "scared, anxious, just generally kind of fearful." The trial

11.

court admitted, over appellant's objection, Officer Hunt's body cam footage at the gas station, time stamp 00:00 – 03:47.

{¶ 32} Officer Hunt testified that he then walked next door to the America's Best hotel "to figure out exactly what crime had taken place, if there were still armed individuals on scene; if so, what they might be wearing or what they might look like, who the victims were." Upon arrival at the America's Best hotel, Officer Hunt testified that he spoke with E.F. and E.E. Officer Hunt conceded that as the men came out of the room, they were laughing. Officer Hunt also testified about his observations of E.E.'s cut lip. The court admitted a photograph that Officer Hunt testified accurately depicted the injury to E.E.'s lip.

{¶ 33} The trial court again overruled appellant's objection to the body cam video, and the state played the portion of Officer Hunt's body cam footage at the hotel with time stamp 06:55-22:53, which was a recording of Officer Hunt's conversations with the other victims at the hotel.

### Adelina Cardenas's Testimony

{¶ 34} Adelina Cardenas testified that on September 21, 2020, she was working as an escort, and she went to the America's Best hotel in Northwood to meet a client and the client's friends in room 149. Cardenas did not have a car, so she paid Troy Glover, who lived in a U-Haul truck, to drive her there in his U-Haul. Cardenas testified that after Glover picked her up that night, Glover stopped on Kelsey Street in Toledo to pick up

12.

another person that Glover introduced to her as Johnny Blaze. Cardenas then identified the appellant as Johnny Blaze.

{¶ 35} Cardenas said that as the three of them arrived at the hotel, Glover noticed that several vehicles in the hotel parking lot had Texas license plates, which he thought meant that Cardenas's client and his friends must have money. Glover asked Cardenas to let him and the appellant walk with her to room 149 so they could push their way into the room. Cardenas said no, and she went to room 149 by herself where she met her client. Cardenas identified her client as J.L., one of R.M.'s coworkers interviewed by Officer Hunt, in a still shot from Officer Hunt's body cam video. Cardenas testified that she and J.L. left the hotel to go to J.L.'s vehicle in the hotel parking lot.

{¶ 36} Glover and the appellant were not in the U-Haul when Cardenas returned, so she called Glover's phone, but she just heard yelling in the background. Cardenas testified that about five minutes after making the call, Glover and the appellant returned to the U-Haul "hyped up" and carrying several items that they did not have before arriving at the hotel. The items included iPhones, a speaker or game, and beer.

### Detective Tina Barrett's Testimony

{¶ 37} Northwood Police Detective Tina Barrett testified about the police investigation into the incident in conjunction with a compilation of clips of hotel

13.

surveillance video[2]  The clips were recorded by several cameras located throughout the hotel's interior and exterior.  The only hotel surveillance video footage with audio was the video taken from a camera behind the front desk.  The other hotel surveillance cameras did not record audio.

{¶ 38} In the video, a U-Haul truck drives into the hotel parking lot and parks. Two men come out of the truck, and they walk into the hotel lobby past the desk clerk. One of the men, later identified as Troy Glover, is wearing bright red shoes and the second man, later identified as appellant, is wearing black shoes with a white sole. According to Detective Barrett's testimony, Glover appears to be carrying a firearm, and the trial court admitted a still shot from the footage of Glover carrying the apparent firearm.

{¶ 39} Glover and the appellant then leave the hotel and return to the U-Haul, and Cardenas enters the hotel lobby.  The surveillance video next shows Cardenas in the hallway outside of room 149 talking to a man.  The man enters room 149 with Cardenas following.  A few minutes later, Cardenas and the man leave the hotel.

{¶ 40} In the next scene, Glover and appellant reenter the hotel and approach room 149.  One knocks while the other stands "with his back flat to the wall," which Detective testifies is what "a police officer does … to hide from a peep hole, not to be seen."  After

---

[2] Appellant objected to the admission of the hotel surveillance video at trial, but he did not raise any arguments regarding the admissibility of the hotel surveillance video in his appeal.

14.

the door is answered, some of the room's occupants come into the hallway, where one of the assailants hits E.E. a couple of times. The victims then start to run away from Glover and the appellant to other areas of the hotel. Glover and appellant do not gain entry into the room at this time.

{¶ 41} Appellant and Glover are next seen in the surveillance video speaking with the front desk clerk. Appellant requests a room key to room 149, claiming he had left his key in his room. The desk clerk refuses to give appellant a key unless appellant provides identification. The appellant attempts to convince the desk clerk to give him a key for a few more minutes before giving up and walking away.

{¶ 42} Appellant and Glover then go back down a hotel hallway, coming across E.F. and R.M. who are walking down the same hallway without shoes on. Glover and appellant appear to direct E.F. and R.M. to return to room 149, and they all go inside the room. Four minutes later, R.M. emerges from room 149 very fast. Detective Barrett testified that R.M. appeared to be in a panic. Glover and appellant come out seconds later carrying a box and run in the opposite direction as R.M.

{¶ 43} R.M. runs straight to the hotel front desk, where he is seen on video frantically attempting to get behind the desk, both through a side door that is locked and then by climbing over the counter. R.M. tells the front desk clerk that he was robbed by two guys and tells the front desk clerk that he needs to hide, but the front desk clerk instructs R.M. to go outside. R.M. runs out of the hotel front door toward the gas station.

15.

At the same time as R.M. is running toward the gas station, the U-Haul is seen leaving the hotel parking lot.

{¶ 44} Detective Barrett then testified about the police investigation following the incident. Police began their investigation by focusing on finding the U-Haul truck. When the U-Haul truck was located soon after the robbery, Troy Glover was inside, wearing the same red shoes as in the hotel surveillance video. Glover was arrested, and police monitored Glover's jail phone calls, learning that a man Glover called "whiteboy Johnny Blaze" and Cardenas were involved in the incident on September 21, 2020.

{¶ 45} The state asked Detective Barrett why she visited an address on Kelsey Street, and appellant objected and requested an in-chambers conference. In chambers, appellant asserted that the state planned to elicit hearsay testimony from Detective Barrett. Specifically, appellant believed that Detective Barrett would testify that she went to a house on Kelsey Street and spoke with a child who told Detective Barrett that "Johnny Blaze" was the child's uncle and gave Detective Barrett the appellant's full name. Because the child would not be testifying at trial, appellant argued that Detective Barrett's testimony would contain inadmissible hearsay. The state asserted that Detective Barrett would not testify about her conversation with the child and would instead testify that the county auditor's website revealed that the house belonged to appellant's sister. Appellant argued that the state could not prove appellant's relationship to the owner of the house using auditor's records, but the court determined that Detective Barrett could

16.

testify about the relationship between appellant and the homeowner and appellant could cross-examine Detective Barrett on the subject.

{¶ 46} Back on the stand, Detective Barrett testified that after Glover's arrest, Glover told her that after picking up Cardenas that night, he went to an address on Kelsey Street to pick up Johnny Blaze. Detective Barrett then used Glover's cell phone location data to track his movements on September 21, 2020. After going to Cardenas's residence, location data from Glover's cell phone showed he stopped at a vacant lot at 1524 Kelsey Street. After the state asked Detective Barrett the significance of that address, and before Detective Barrett answered, appellant objected.

{¶ 47} In a second in-chambers discussions, appellant expressed concerns about the accuracy of the auditor's website, contending that the state had not provided any printouts from the auditor's website and that 1524 Kelsey Street was not his sister's address. The state responded that 1524 Kelsey Street was the address of the vacant lot, not the neighboring lot. The trial court did not rule on appellant's objection, explaining that there was no real objection because no hearsay had yet occurred and instructing appellant to raise an objection if hearsay testimony did occur.

{¶ 48} Back on the stand, Detective Barrett testified as follows:

Q. Detective, you indicated you went to the 1524 area of Kelsey Street, correct?

A. Correct.

17.

Q. Was there actually a house on that property, the first place you went to on Kelsey Street?

A. No. It was an empty lot.

Q. What did you do after observing there was an empty lot at the location?

A. Went next door.

Q. Okay. And what was significant in terms of who owns the next door home on Kelsey Street?

A. According to the auditor's website, Lucas County auditor's website, it's owned by Amber Cohen.

Q. What further investigation did you do with respect to Ms. Cohen and her relationship with [appellant]?

A. They were brother and sister.

Appellant did not object, and Detective Barrett did not testify further on the subject.

{¶ 49} Detective Barrett next testified that she found a Facebook profile with appellant's name. Detective Barrett noted that in some of the Facebook photos associated with that profile, appellant was wearing the same shoes—black with white soles—as the second assailant in the hotel surveillance video. Detective Barrett also found several pictures on Facebook in which appellant's tattoos were visible, which she matched up with the tattoos visible on the second assailant in the surveillance video.

18.

{¶ 50} Appellant cross-examined Detective Barrett but did not pose any questions about the auditor's website or how Detective Barrett had concluded that appellant and Cohen were siblings.

### Jury View of Appellant's Arms

{¶ 51} Following Detective Barrett's testimony comparing the tattoos of the second assailant visible on the hotel surveillance video to photos on appellant's Facebook profile, the jury requested to see appellant's tattoos. Accordingly, after Detective Barrett was excused from the witness stand, the court instructed the appellant to pull up his sleeves and show his arms to members of the jury.

### Testimony of Officer Christopher Buck

{¶ 52} Finally, Northwood Police Officer Christopher Buck testified. Officer Buck administered a blind photo array containing photos of appellant as well as several other men to Cardenas on July 5, 2022. Officer Buck testified that Cardenas identified the photo of appellant as the man she knew as Johnny Blaze.

{¶ 53} After Officer Buck's testimony, the state rested. Appellant moved for a judgment of acquittal pursuant to Crim.R. 29, and the trial court denied the motion. Appellant rested without calling any witnesses or testifying himself. The jury found appellant guilty of robbery in violation of R.C. 2911.02(A)(2) and R.C. 2911.02(B), and the court later sentenced him to a definite prison term of six years and an indefinite term of nine years.

19.

## IV. Law and Analysis

{¶ 54} In his sole assignment of error, appellant argues the trial court erred in denying the appellant's motion in limine and admitting impermissible hearsay that violated the Confrontation Clause of the Sixth Amendment of the United States Constitution. Appellant points specifically to the admission of the body cam video of Officer Hunt's conversations with the victims and Detective Barrett's testimony about how she connected appellant with the vacant lot. Appellant claims that the only evidence establishing that appellant had a deadly weapon, which appellant alleges is an essential element of robbery, were the victims' statements in the body cam video. Further, appellant argues that excluding the body cam video and Detective Barrett's testimony about her initial identification of appellant as a suspect, the state did not establish he was the assailant.

{¶ 55} The state argues that the body cam video contained nontestimonial statements that fall under the excited utterance and present-sense impression exceptions to hearsay. Even if the body cam video was improperly admitted, the state argues that the admission of the video was harmless error. The state cites the other evidence at trial, including Cardenas's testimony regarding the planning of the robbery and the appellant's actions following the robbery, the hotel surveillance video, the similarity in appellant's tattoos and shoes to the second assailant in the hotel surveillance video, and Detective Barrett's testimony regarding the investigation, as establishing the elements of robbery

20.

and identifying appellant as the perpetrator. The state did not address appellant's arguments regarding Detective Barrett's testimony.

## A. Body Cam Video

{¶ 56} Appellant argues the admission of the body cam video violated the Confrontation Clause of the Sixth Amendment and contained impermissible hearsay. "Although the hearsay rules and the Confrontation Clause are generally designed to protect similar ideals, the two are not equivalent." *State v. Issa*, 93 Ohio St.3d 49, 60, 752 N.E.2d 904 (2001). For an out-of-court statement to implicate the Confrontation Clause, the statement must be testimonial in nature, and not all hearsay statements are testimonial. *State v. Fitts*, 6th Dist. Wood No. WD-18-092, 2020-Ohio-1154, ¶ 17. Because only testimonial hearsay implicates the Confrontation Clause, the admissibility of an out-of-court statement under hearsay rules must be analyzed separately from whether the admission of the statement would violate the Confrontation Clause. *See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 181 (explaining that a victim's out-of-court statements to a police officer that fell under the excited-utterance exception to the rule against hearsay must also be analyzed under the Confrontation Clause). Each issue is addressed below.

## 1. Confrontation Clause

{¶ 57} Appellant argues that the admission of the entire body cam video violated his Confrontation Clause rights, contending the victims' statements in the video were

21.

testimonial statements made during the course of an investigation. Because of the length of time that elapsed between the incident and the recording of the body cam video, appellant argues the statements were not made during an ongoing emergency.

{¶ 58} The state contends that the body cam video was recorded shortly after an armed robbery, and therefore during an ongoing emergency, so the Confrontation Clause was not violated. In support, the state points out that the police were still attempting to figure out what had happened and whether armed assailants were still at large.

{¶ 59} Accused parties have the right to confront witnesses making testimonial statements pursuant to the Confrontation Clause of the Sixth Amendment to the United States Constitution. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 214, citing *United States v. Crawford*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177. Accordingly, the Sixth Amendment bars testimonial statements made by a declarant not appearing at trial so that an accused may cross-examine that declarant. *Id*. " 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *State v. Issa*, 93 Ohio St.3d at 59, 752 N.E.2d 904, quoting *State v. Madrigal*, 87 Ohio St.3d 378, 384, 721 N.E.2d 52 (2000), quoting *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

{¶ 60} Because "only testimonial hearsay implicates the Confrontation Clause," the admission of nontestimonial statements does not violate the Confrontation Clause.

22.

*State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 185. Whether statements are testimonial in nature depends on the primary purpose of the statements. *Id*. A statement is testimonial if made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 46, quoting *Crawford* at 53.

{¶ 61} To determine the primary purpose of a statement made to the police, a court must consider whether an ongoing emergency existed at the time the statement was made. *State v. Ford*, 6th Dist. Lucas No. L-20-1054, 2021-Ohio-3058, ¶ 22. "Statements are nontestimonial when made 'in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.'" *Id*., quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). If, however, "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution," then the statements are testimonial. *Id*., quoting *Davis* at 822.

{¶ 62} "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Michigan v. Bryant*, 562 U.S. 344, 363, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). A court must consider "'the statements and actions of both the declarant and interrogators.'" *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 155, quoting *Bryant* at 367. If an officer is "not seeking to determine ... 'what is

23.

happening,' but rather 'what happened,'" then the victim's statements are likely testimonial. *Davis* at 830.

{¶ 63} Whether a risk still exists to the victims, the public, or the police is another important factor. If the witness is severely injured, then a court may be more likely to find an ongoing emergency existed. *See Michigan* at 365. The type of weapon involved is also relevant, with an assailant with a gun posing a greater risk to the police and the public, even if the assailant is no longer on the scene. *Jones* at ¶ 151. If, however, a crime was targeted and involved a "narrower zone of potential victims," such as in a domestic violence case, then the threat may have been neutralized when the assailant left the scene. *Id.*

{¶ 64} Finally, the more formal the encounter was, the more likely that the statements are testimonial. *See Ohio v. Clark*, 576 U.S. 237, 245, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015). If the interrogation took place in police headquarters, then the witness's statements are likely testimonial. *Bryant* at 360. *See also State v. Sproles*, 6th Dist. Lucas No. L-22-1184, 2023-Ohio-3403, ¶ 30 (holding that a victim's statement to police was nontestimonial in part because it was made at the crime scene and not at the police station). Likewise, if the statements were given in response to a police interrogation, i.e., "knowingly given in response to structured police questioning," then they are more likely to be testimonial. *See Crawford*, 541 U.S. at 53, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 4. However, "[f]ormality is not the sole touchstone of our primary

24.

purpose inquiry because… informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." *Bryant* at 366.

{¶ 65} The primary purpose of a statement may change as the interrogation progresses, and "a conversation which begins as an interrogation to determine the need for emergency assistance can evolve into testimonial statements." *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948 at ¶ 152. Once the emergency ends, the witness's statements may become testimonial. *Id.*

{¶ 66} A court must "objectively evaluat[e] the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occur[ed]." *Bryant*, 562 U.S. at 370, 131 S.Ct. 1143, 179 L.Ed.2d 93. A statement is testimonial if it is made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 46, citing *Crawford* at 53.

{¶ 67} This court has held that body cam video of victim statements made to the police shortly after the crime occurred, while an assailant is potentially armed and still at large, are nontestimonial in nature. *State v. Sproles*, 6th Dist. Lucas No. L-22-1184, 2023-Ohio-3403, ¶ 30-31; *Ford*, 6th Dist. Lucas No. L-20-1054, 2021-Ohio-3058 at ¶ 21-24. In *Sproles* and *Ford*, this court held that the statements made by victims shortly after the crime occurred who were visibly upset in a location other than police headquarters were not testimonial. *Id.* In *Sproles*, the court explained that the appellant still

25.

"presented a threat to [the victim], other witnesses, the public, and any officers who might come into contact with him." *Sproles* at ¶ 30.

{¶ 68} In contrast, we have also held that a victim's statements to police "made after two officers had secured the scene" were testimonial. *Toledo v. Sailes*, 180 Ohio App.3d 56, 2008-Ohio-6400, 904 N.E.2d 543, ¶ 17 (6th Dist.). Similarly, we held that no ongoing emergency existed in a domestic violence case even though the police had arrived on scene 10 to 15 minutes after the 911 call and the alleged perpetrator was still on scene, because the police officers were able to secure the scene by separating the victim and perpetrator. *Toledo v. Green*, 2015-Ohio-1864, 33 N.E.3d 581, ¶ 21-24 (6th Dist.).

{¶ 69} Here, the statements of R.M. from the body cam video at the gas station, time stamp 00:00 - 03:47, were made during an ongoing emergency and thus nontestimonial. R.M. had just fled to a gas station to escape armed assailants, leaving behind his shoes and cell phone. Officer Hunt described R.M.'s demeanor as "scared, anxious, just generally kind of fearful." Officer Hunt questioned R.M. to assess the existence of a threat. He asked if the assailants had a weapon and inquired into the type of weapon. He asked several questions to determine the whereabouts of both the assailants and E.F. Indeed, neither R.M. nor Officer Hunt knew whether the assailants were still in the hotel room with E.F. After talking to R.M., Officer Hunt immediately went to the hotel "to figure out exactly what crime had taken place, if there were still

26.

armed individuals on scene; if so, what they might be wearing or what they might look like, who the victims were." Accordingly, the admission of the body cam video from the gas station did not violate the Confrontation Clause.

{¶ 70} Likewise, the initial body cam video at the hotel, time stamp 06:55-9:40, was recorded during an ongoing emergency. The police were unsure whether the armed assailants were still in room 149. Officer Hunt approached room 149 with caution, and R.M. remained down the hallway, several feet away. Less than 15 minutes had passed since the 911 call was made from the gas station. The admission of the initial body cam video at the hotel, time stamp 06:55-9:40, also did not violate the Confrontation Clause.

{¶ 71} However, the third segment admitted at trial, the body cam video at the hotel with victim conversations, time stamp 09:41-22:52, was not recorded during an ongoing emergency. Although some factors weigh in favor of finding an ongoing emergency, such as the short period of time that had elapsed since the crime had occurred and the assailant's possession of a weapon, the totality of the circumstances surrounding the incident establish that the emergency had concluded.

{¶ 72} Once E.E., E.F., and J.L. came out of the hotel room, it was almost immediately clear that the assailants were gone. Officer Hunt called R.M. from where he was standing several feet away for safety to come join the group standing immediately outside room 149. Officer Hunt's conversation with the victims was calm. None of the victims appeared to be under distress, and they even joked and laughed at times. Further,

27.

the actions of the victims other than R.M. indicated that they considered the incident to be over once the assailants left. Only R.M. contacted the police for help, and E.F. remained in room 149. E.E. and J.L. even joined E.F. in the room after the incident.

{¶ 73} The threat to the public was also low. R.M. reported to the police that the assailants had specifically demanded to be let into room 149, which strongly suggested that the robbery had been a targeted attack. Indeed, Officer Hunt questioned the victims to determine why the assailants had targeted room 149, asking R.M. if he knew the two guys as well as E.E., E.F., and J.L. if they had seen the two guys around before the incident occurred. E.F. did report that the assailants had a gun (though R.M. thought it was a knife), but E.F. and R.M. said that the assailant had not pointed it at them and had not even taken the weapon out of the waistband of his pants during the incident.

{¶ 74} In addition, while Officer Hunt did obtain information that could assist other officers in locating the suspects, such as more detailed descriptions of the assailants and whether anyone had seen where they went, most of Officer Hunt's questioning was directed to proving or establishing that the past event occurred. He asked for detailed descriptions of the stolen items, including brand and model, from each victim, and he wrote each answer down. Officer Hunt asked several structured questions about the location of the incident and who had been in the room at the time, and he reviewed the sequence of events with the victims. Officer Hunt was no longer "seeking to determine

28.

... 'what is happening,' but rather 'what happened.'" *Davis*, 547 U.S. at 830, 126 S.Ct. 2266, 2278, 165 L.Ed.2d 224.

{¶ 75} A reasonable declarant in these circumstances would believe that their statements potentially could be used in a prosecution. Accordingly, this segment of the body cam video, time stamp 09:41-22:52, contained testimonial statements, and its admission violated the Confrontation Clause.

## 2. Hearsay

{¶ 76} Because the Confrontation Clause is only implicated by testimonial hearsay, we must also consider whether the body cam video contained inadmissible nontestimonial hearsay. *State v. Moss*, 6th Dist. Lucas No. L-19-1047, 2020-Ohio-2862, ¶ 22 ("While it is true that nontestimonial hearsay does not implicate the confrontation clause of the Sixth Amendment, courts must still address the separate, hearsay issue.") Hearsay is a statement made by someone other than the declarant while testifying, "offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Although hearsay is generally inadmissible, several exceptions to the rule against hearsay exist, including present-sense impressions and excited utterances. Evid.R. 803(1) and (2).

{¶ 77} Appellant contends that all admitted portions of the body cam video contained inadmissible hearsay. According to appellant, neither the present-sense impression nor the excited utterance exceptions to the rule against hearsay apply because

29.

the statements were not made during or immediately following the incident. Appellant points out that portions of the interviews with the victims in the hotel occurred at least 25 minutes later.

{¶ 78} The state contends that the excited utterance exception applies to the body cam video of Officer Hunt's initial encounter with R.M. at the gas station when R.M. had just minutes before fled shoeless from an attack at the hotel. The state also maintains that the second portion of the body cam video involving Officer Hunt's interactions with the other victims at the hotel was similarly shortly after a startling event. Finally, the state argues that the trial court did not err in holding the present-sense impression exception also applied, reasoning that the trial court could not have abused its discretion when the court admitted some portions of the video but not all.

{¶ 79} An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). A present-sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1). A victim's statements to police shortly after a robbery occurred describing the incident and the stolen property while the victim was "still under stress of excitement from the robbery" fall under both the present-sense impression and

30.

excited-utterance exceptions to the rule against hearsay. *State v. Santellana*, 6th Dist. Lucas No. L-19-1088, 2020-Ohio-5041, ¶ 29.

{¶ 80} Here, R.M. was still clearly under the stress of excitement from the incident in the hotel when he spoke to Officer Hunt outside the gas station. As Officer Hunt testified, R.M. was "scared, anxious, just generally kind of fearful," the incident had occurred just minutes before, and R.M.'s statements consisted of a description of the incident as well as the suspects. Accordingly, the body cam video from the gas station fell under both the present-sense impression and excited-utterance exceptions to the rule against hearsay, and the trial court did not err in admitting the video.

{¶ 81} Further, even if the admission of the body cam video from the hotel with time stamp 09:41-22:52 had not violated the Confrontation Clause, its admission would still have been erroneous because it contained inadmissible hearsay. In that segment of the video, none of the victims or witnesses appear to be experiencing excitement from the stress of the incident. They appear relaxed as they spoke with Officer Hunt, even laughing at times. Accordingly, the present-sense impression and excited-utterance exceptions do not apply, and the trial court improperly admitted the portion of the body cam video at the hotel with the time stamp 09:41-22:52.

### 3. Harmless Error

{¶ 82} Having determined that the trial court erred in admitting one segment of the body cam video from the hotel, we must determine the effect of that error. *State v.*

*LaRosa*, 165 Ohio St.3d 346, 2021-Ohio-4060, 179 N.E.3d 89, ¶ 37. An appellate court may not reverse a judgment due to the trial court's error in admitting evidence at trial if the error was harmless. *State v. Moore*, 2021-Ohio-765, 168 N.E.3d 921, ¶ 37 (6th Dist.). *See also Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 178 (applying a harmless-error analysis to claims involving the Confrontation Clause as well as hearsay).

{¶ 83} Harmless error is "'any error, defect, irregularity, or variance which does not affect substantial rights.'" *State v. Kamer*, 6th Dist. Wood No. WD-20-084, 2022-Ohio-2070, ¶ 154, quoting Crim.R. 52(B). "The state bears the burden of proving that the error did not affect a defendant's substantial rights." *Id.*, citing *Moore* at ¶ 33. "When determining whether a trial court's improper admission of other acts evidence affected the substantial rights of a defendant, an appellate court must (1) determine whether the error prejudiced the defendant (i.e., the error affected the verdict), (2) declare a belief that the error was not harmless beyond a reasonable doubt, and (3) excise the improper evidence from the record, look to the remaining evidence, and determine whether there is evidence beyond a reasonable doubt of defendant's guilt." *Kamer* at ¶ 155, citing *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 27. "In other words, 'an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence.'" *Id.*, quoting *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 33.

{¶ 84} The state argues that even if the court improperly admitted the body cam video, the remaining evidence was sufficient to support appellant's conviction, and therefore the trial court's error was harmless. We agree.

{¶ 85} Excluding the body cam video in the hotel, the state presented significant evidence that a robbery occurred. The body cam video from the gas station includes several statements from R.M. regarding the elements of the robbery. R.M. stated that two guys threatened to kill him unless he let them into room 149, they brandished a weapon, they demanded money, and they took items, including a gaming system. Cardenas testified of Glover and the appellant's plans to rob the occupants of room 149, and that Glover and the appellant returned to the U-Haul "hyped up" with items they did not have when they arrived at the hotel, including a gaming system. The hotel surveillance video shows appellant and Glover entering the hotel emptyhanded and leaving with several small items and a box. The hotel surveillance video also shows that one of the assailants brandished a weapon and the two assailants started a physical altercation with the victims, with one of them punching E.E.

{¶ 86} Appellant argues that without the body cam video, there was insufficient evidence to identify him as the assailant. However, the state presented other evidence identifying appellant as the assailant. The hotel surveillance video contained images of appellant, including his tattoos, which the appellant himself displayed to the jury during the trial. Appellant's Facebook profile also contained photos of appellant's tattoos and of

33.

him wearing shoes in a similar style as in the surveillance video. Cardenas identified appellant as the man who went with her to the hotel on the night of the evening. Accordingly, the state presented sufficient evidence to establish appellant's identity without the body cam video of Officer Hunt's conversations with the victims, time stamp 09:41-22:52.

{¶ 87} Although the trial court erred in admitting the bodycam video from the hotel with the time stamp 09:41-22:52, the error was harmless. Therefore, we find appellant's arguments regarding the body cam video in support of his assignment of error not well-taken.

### B. Detective Barrett's Testimony

{¶ 88} Appellant also argues that Detective Barrett's testimony regarding her initial identification of appellant as a suspect was "full of multiple examples of hearsay," citing ten pages of the trial transcript containing the entirety of two in-chambers discussions and Detective Barrett's testimony about the Kelsey Street address. Appellant's primary contention with Detective Barrett's testimony was that the state did not call the child from whom Detective Barrett learned appellant's full name to testify. Appellant characterizes Detective Barrett's testimony about the auditor's website as a "back door" the state used to present evidence connecting appellant to the property, contending that even with the testimony about the auditor's website, Detective Barrett could not conclude that Cohen and appellant were siblings. Appellant asserted that he

34.

could not cross-examine Detective Barrett about her testimony regarding his connection to Cohen because of the hearsay.

{¶ 89} However, appellant has not pointed to any specific testimony containing an out-of-court statement. Detective Barrett did not testify about her conversation with the child. The parties only discussed Detective Barrett's conversation with the child in chambers, and the jury never heard any testimony about the conversation. Likewise, appellant has not cited any legal authority to support his contention that a witness's testimony about a conclusion she reached based on an out-of-court statement is somehow hearsay even without the admission of the out-of-court statement. [3] Testimony can only be hearsay if it contains an out-of-court statement. Evid.R. 801(C); *State v. Maurer*, 15 Ohio St.3d 239, 262, 473 N.E.2d 768 (1984) (explaining that the first step in a hearsay analysis is to determine whether the evidence contains an out-of-court statement). Appellant also has not explained why he was unable to cross-examine Detective Barrett about her conclusion that Cohen was appellant's sister. "Appellate courts 'are not obligated to search the record or formulate legal arguments on behalf of the parties.'" *State v. Boles*, 6th Dist. Lucas No. L-19-1080, 2021-Ohio-363, ¶ 23, citing *Risner v. Ohio*

---

[3] This portion of appellant's argument appears to go to foundation rather than hearsay, but because appellant did not assign an error relating to foundation, we cannot consider arguments relating to foundation. *See Reece v. Grange Grdn. Ins. Co.*, 6th Dist. Lucas No. L-03-1290, 2004-Ohio-5668, ¶ 24 (explaining that an appellate court can only consider arguments related to the stated assignment of error).

35.

*Dep't of Nat. Res., Ohio Div. of Wildlife*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 28.

{¶ 90} Further, even if appellant had presented a cogent hearsay argument, appellant did not timely object to Detective Barrett's testimony. Although appellant did make two preliminary objections seeking to prevent Detective Barrett from testifying about her conversation with the child, these objections preceded Detective Barrett's testimony about appellant's connection to the Kelsey Street address. The trial court did not rule on appellant's objections in chambers, explaining that the objections were premature because Detective Barrett had not yet given any hearsay testimony and directing appellant to object again if hearsay occurred. When Detective Barrett testified about the auditor's website and appellant's relationship with Cohen—when an objection would have been timely—appellant did not object.

{¶ 91} If an appellant fails to timely object at trial, or fails to object on the basis argued on appeal, the appellate court applies a plain-error standard of review. *State v. Tibbetts*, 92 Ohio St.3d 146, 160-161, 749 N.E.2d 226 (2001). For an appellate court to reverse a judgment under a plain-error analysis, the appellant must make a "showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16.

36.

{¶ 92} Here, even without Detective Barrett's testimony regarding appellant's connection to the Kelsey Street address, appellant has not shown the outcome of his trial would have been different. The state presented other evidence identifying appellant as the assailant. As already discussed above, the hotel surveillance video, appellant's Facebook photos, appellant's tattoos, and Cardenas's testimony were sufficient for a jury to determine appellant was one of the assailants. Accordingly, appellant's arguments regarding Detective Barrett's testimony in support of his assignment of error are not well-taken.

## V. Conclusion

{¶ 93} Appellant's assignment of error is overruled. We therefore affirm the August 18, 2022 judgment of the Wood County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

37.

Christine E. Mayle, J.      

_____
JUDGE

Gene A. Zmuda, J.       

_____
JUDGE

Myron C. Duhart, P.J.    
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.