[Cite as *State v. Wallace*, 2024-Ohio-2201.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                          Court of Appeals No. E-23-046

      Appellee                                   Trial Court No. 2022 CR 0209

v.

Kyle Wallace                                          **DECISION AND JUDGMENT**

      Appellant                                  Decided:  June 7, 2024

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Misty Wood, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Kyle Wallace, appeals the July 20, 2023 judgment of the Erie

County Court of Common Pleas sentencing him to 10 months in prison.  For the

following reasons, we reverse.

## I. Background and Facts

{¶ 2} Wallace was charged with one count of domestic violence in violation of R.C. 2919.25(A) and (D)(3), a fourth-degree felony.

{¶ 3} Wallace's case was tried to a jury beginning on June 21, 2023. At trial, the state presented the testimony of sergeant John Orzech and detective Brian Clayman of the Huron Police Department. The parties also stipulated that Wallace has a prior domestic violence conviction. Although J.T., the alleged victim, was properly subpoenaed, she did not appear at trial.

{¶ 4} On May 23, 2022, Orzech, Clayman, and a third officer, officer Firment, responded to an anonymous 911 call reporting a "physical domestic violence" incident at the trailer where Wallace and J.T.—whom Orzech described as "long-term boyfriend-girlfriend [who] had a couple kids together"—lived.[1] Orzech and Clayman each testified that they were familiar with Wallace's and J.T.'s voices from prior conversations and could recognize their voices. J.T. was not the 911 caller.

{¶ 5} Orzech and Firment were the first to arrive at the trailer. When they got there, Orzech could hear two adults—Wallace and J.T.—yelling at each other. J.T. told Wallace "to get the F out of the trailer." Clayman arrived soon after the other officers and stood outside the fence around the trailer's yard. He could hear noises coming from the trailer, but could not otherwise discern what was happening.

---

[1] The state played a recording of the 911 call for the jurors, but the trial court ultimately decided not to admit the call as an exhibit. The call was not proffered or otherwise made part of the record, so we are unable to review it.

2.

**{¶ 6}** When Orzech knocked, J.T. answered the door. Orzech described her as "[v]ery, very upset and shaken." He immediately noticed that she had a red mark under her right eye and some swelling, and later noticed that she also had a swollen lip. He did not see any injuries on Wallace.

**{¶ 7}** Orzech, who was standing on the porch of the trailer, told J.T. that they were there to investigate a domestic violence complaint. When he asked where Wallace was, J.T. pointed to the other end of the trailer. Orzech called for Wallace to come talk to him. Wallace eventually did. When he came to the door, he told the officers to get off of his property and said they had no reason to be there. He tried to close the door, but J.T. stopped him. At that point, Wallace said he was going to leave and go to his nephew's or cousin's house. Orzech conceded on cross-examination that Wallace going to his relative's house would have complied with J.T.'s request for him to leave the trailer.

**{¶ 8}** After Orzech informed Wallace that he was there to investigate a complaint and that he needed to speak with the couple, Wallace left the trailer. The officers followed him. When they caught up to him, Orzech ordered him to stop walking so that they could investigate the complaint. Wallace turned to them and told them not to touch him. At that point, the officers handcuffed Wallace and walked him back to the porch of the trailer.

**{¶ 9}** Once Wallace was seated on the porch, Clayman and Firment went into the trailer to talk to J.T., while Orzech stayed on the porch with Wallace. Clayman described J.T. as "visibly shaken . . . upset with what had just occurred." Her face was red and she

3.

"[s]howed signs of being . . . just recently involved in some type of altercation." He also noticed that she had redness below her right eye and a swollen lip that was getting "increasingly more swollen while we were there." Based on his training, Clayman believed that J.T.'s injuries were "fresh, recent injuries that would have just occurred." He categorized her injuries as physical harm, but not serious physical harm.

{¶ 10} Over Wallace's objection on Confrontation Clause grounds, Clayman testified to statements J.T. made to him and Firment while they were inside the trailer. According to Clayman, J.T. "confronted Mr. Wallace about yelling at the children and . . . Mr. Wallace . . . started throwing items at [J.T.] and a set of batteries struck [J.T.] in the face. Also during the argument that was happening, there was a threat to kill . . ." J.T. Clayman saw "items strewn about the house" that J.T. claimed Wallace had thrown at her, but did not see any batteries. He also saw a hammer near the trailer's door, which J.T. claimed was in Wallace's hands when officers knocked.

{¶ 11} While Orzech was on the front porch with Wallace, Wallace was "very flustered and upset at [the officers'] presence and that he was in the handcuffs." He would "continually" stand up and yell into the trailer that J.T. should "tell [officers] that nothing physical occurred and that they were just arguing."

{¶ 12} The officers asked J.T. to provide a written statement, but she refused. She also refused medical treatment and would not allow the officers to take photographs of her injuries. The officers did not force her to be photographed, which is "how [they] usually go about that situation." On cross, each officer confirmed that there are no

4.

pictures, medical reports, or testimony from J.T. in this case, and Orzech confirmed that J.T. refused to file a domestic violence complaint against Wallace.

{¶ 13} After the officers testified, the state rested. Wallace moved for acquittal under Crim.R. 29 because there was evidence that the parties were "screaming and carrying on" but no evidence that Wallace harmed anyone. The trial court denied his motion because there was evidence of fresh injuries on J.T.'s face, and "the jury will ultimately decide better than [the judge] whether this conduct amounts to what the charge is."

{¶ 14} Wallace did not present any evidence.

{¶ 15} The jury found Wallace guilty of fourth-degree-felony domestic violence. The trial court sentenced him to 10 months in prison.

{¶ 16} Wallace now appeals, raising two assignments of error:

Testimony regarding the statements of the alleged victim who did not appear at court should not have been allowed.

Defendant's Rule 29 Motion for acquittal or for a reduction in charges should have been granted due to lack of evidence of harm.

## II. Law and Analysis

### A. Admission of J.T.'s statements violated Wallace's right to confront witnesses.

{¶ 17} In his first assignment of error, Wallace argues that the trial court violated his right to confront the witnesses against him by allowing the officers to testify to J.T.'s statements. He contends that J.T.'s statements were testimonial because there was no

5.

ongoing emergency when she made the statements to the officers. The state "agrees that the victim's statements to Detective Clayman were testimonial." However, the state argues that admission of the testimony was harmless because the properly-admitted evidence overwhelmingly shows that Wallace is guilty of domestic violence.

{¶ 18} The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless [she] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." "[T]he proper analysis for determining whether out-of-court statements violate the Confrontation Clause is . . . whether they are testimonial in nature." *Toledo v. Sailes*, 2008-Ohio-6400, ¶ 13 (6th Dist.), citing *Crawford* at 61. We conduct a de novo review of evidentiary rulings that implicate the Confrontation Clause. *State v. McKelton*, 2016-Ohio-5735, ¶ 97.

{¶ 19} Statements are nontestimonial when made "in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). By contrast, statements are testimonial when "the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially

6.

relevant to later criminal prosecution." *Id.*; *State v. Montgomery*, 2016-Ohio-5487, ¶ 87 (A statement is "testimonial" if it is "made for a primary purpose of creating an out-of-court substitute for trial testimony." (Internal quotation omitted.)).

{¶ 20} Whether an emergency exists and is ongoing "is a highly context-dependent inquiry." *Michigan v. Bryant,* 562 U.S. 344, 363 (2011). A court must consider "'the statements and actions of both the declarant and interrogators . . . .'" *State v. Jones*, 2012-Ohio-5677, ¶ 155, quoting *id.* at 367. If an officer's questions are aimed at determining "what happened"—as opposed to "what is happening"—the victim's responses are likely testimonial. *State v. Stevenson*, 2023-Ohio-4853, ¶ 62 (6th Dist.), citing *Davis* at 830. That is not the only consideration, however. We must also consider whether there is a continuing risk to the victim, officers, or public and the formality of the encounter during which the victim made the statements. *Id.* at ¶ 63-64.

{¶ 21} Generally speaking, once a suspect is separated from the victim by the police, any ongoing emergency ends and the victim's statements become testimonial because, at that point, the primary purpose of the statements is establishing past events that might be relevant to a future prosecution of the suspect. *See, e.g., Davis* at 829-832 (victim's statements were testimonial because she was physically separated from the suspect by police officers, was under police protection, and described "how potentially criminal past events began and progressed"); *State v. Fry*, 2010-Ohio-1017, ¶ 104 (victim's statements were testimonial because the suspect was in a police cruiser outside of the apartment and her statements related to past events, not something that was

7.

currently happening); *State v. Smith*, 2019-Ohio-3257, ¶ 12-13 (1st Dist.) (witness's statements were testimonial because, among other things, she made them after police handcuffed the suspect, which "neutraliz[ed] any conceivable threat," and police elicited the statements by asking about what had happened in the past, not what was currently happening). By way of comparison, this is generally not the case when the suspect leaves the scene on their own, or police are unsure if the suspect left the scene. *See, e.g., State v. Ford*, 2021-Ohio-3058, ¶ 24-25 (6th Dist.) (although suspect left the scene, victim's statements were nontestimonial because she made them minutes after the assault to help police identify and locate suspect whose location was unknown); *State v. Sproles*, 2023-Ohio-3403, ¶ 30 (6th Dist.) (although suspect left the scene, victim's statements were nontestimonial because she made them to help police identify and locate armed suspect whose location was unknown); *State v. Matthews*, 2010-Ohio-4153, ¶ 30-33 (2d Dist.) (victim's statement that she was stabbed in the ear, made while she was receiving emergency medical care, was nontestimonial because police thought they were responding to a fall and did not know if the suspect was still in the house; statements victim made after emergency medical treatment ended were testimonial because the ongoing emergency was over and the statements were sought for future prosecution).

{¶ 22} Here, Orzech did not testify to any statements that J.T. made to him, beyond saying that she pointed to the area of the trailer where Wallace was. Assuming that this was a statement, it was nontestimonial. Orzech heard Wallace and J.T. yelling when he got to the trailer, saw that J.T. had a red mark on her face, and did not know

8.

where Wallace was at the time. The primary purpose of Orzech asking for Wallace's location was ensuring J.T.'s safety, not obtaining information about Wallace's actions that could be used against him in a future prosecution. Thus, Orzech was properly allowed to testify about J.T. pointing out Wallace's location.

{¶ 23} However, the statements Clayman testified to are different story. Clayman did not speak to J.T. until after the officers had apprehended Wallace outside the trailer, handcuffed him, and sat him on the trailer's porch, where he was away from J.T. and guarded by Orzech. At that point, any threat Wallace may have posed to J.T., the officers, or the public had been neutralized. The questions Clayman asked were not designed to alleviate an emergency situation. Instead, they were intended to find out what had happened in the past, before officers got there—not what was currently happening—with the intent of making a case against Wallace. Because there was not an ongoing emergency and Clayman's questions were designed to elicit information potentially relevant to a future prosecution, the statements J.T. made to him were testimonial, and the trial court erred by allowing Clayman to testify to her statements.

{¶ 24} As the state points out, however, a Confrontation Clause violation can be harmless error. *State v. Beasley*, 2018-Ohio-493, ¶ 178, citing *McKelton*, 2016-Ohio-5735, at ¶ 192. Harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights . . . ." Crim.R. 52(B). The state bears the burden of proving that an error did not affect a defendant's substantial rights. *State v. Moore*, 2021-Ohio-

9.

765, ¶ 37 (6th Dist.), citing *State v. Morris*, 2014-Ohio-5052, ¶ 23; and *State v. Perry*, 2004-Ohio-297, ¶ 15.

{¶ 25} When determining whether a trial error affected the substantial rights of a defendant, an appellate court must (1) determine whether the error prejudiced the defendant (i.e., the error affected the verdict); (2) declare a belief that the error was not harmless beyond a reasonable doubt; and (3) excise the improper evidence from the record, look to the remaining evidence, and determine whether there is evidence beyond a reasonable doubt of defendant's guilt. *State v. Harris*, 2015-Ohio-166, ¶ 37, citing *Morris* at ¶ 25, 27-29, 33. In other words, "an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Morris* at ¶ 33.

{¶ 26} In this case, we find that Clayman's testimony about J.T.'s statements was prejudicial. This testimony was the only evidence of what happened in the trailer before the police arrived, and the only evidence establishing that Wallace knowingly caused the physical harm to J.T. that the officers identified—elements that are required for a conviction under R.C. 2919.25(A). When evidence that violates the Confrontation Clause is the only evidence establishing essential elements of a charged offense, admission of the evidence is "clearly prejudicial." *State v. Johnson*, 2023-Ohio-445, ¶ 85 (8th Dist.).

{¶ 27} Next, we must consider whether the trial court's admission of Clayman's account of J.T.'s statements was harmless beyond a reasonable doubt. An error in

10.

admitting evidence is harmless beyond a reasonable doubt when there is no reasonable possibility that the improper evidence contributed to the conviction. *McKelton* at ¶ 192, citing *Schneble v. Florida*, 405 U.S. 427, 432 (1972). Considering that the improper evidence in this case established at least two of the elements of the domestic violence charge (i.e., that Wallace knowingly caused physical harm), there is a reasonable possibility that the evidence contributed to the conviction. Thus, we cannot say that the trial court's error was harmless beyond a reasonable doubt.

{¶ 28} Finally, we must excise the improper evidence and look at the remaining evidence in the case to determine whether there is evidence beyond a reasonable doubt of Wallace's guilt. For a finding of harmless error to be appropriate, the case must involve either (1) overwhelming evidence of guilt or (2) some other indicia that the error did not contribute to the conviction. *State v. Rahman*, 23 Ohio St.3d 146, 151 (1986), citing *State v. Ferguson*, 5 Ohio St.3d 160, 166, fn. 5 (1983). Our role in this inquiry is "'not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony on the jury.'" *Morris*, 2014-Ohio-5052, at ¶ 29, quoting *Rahman* at 151, fn. 4.

{¶ 29} In Wallace's case, there is neither overwhelming evidence of guilt nor some other indication that the admission of J.T.'s statements did not contribute to the conviction. Without her statements, the evidence shows (1) an anonymous neighbor called 911 to report, as the officers described it, a "physical domestic violence" at Wallace and J.T.'s trailer; (2) Wallace and J.T. were "long-term boyfriend-girlfriend" and had children together; (3) Orzech heard a man and a woman (Wallace and J.T.) yelling

11.

when he arrived at the trailer; (4) J.T. seemed "shaken" and "upset" to the officers; (5) J.T. had a red mark on her face, some swelling, and a swollen lip; (6) Clayman thought J.T.'s injuries were "fresh, recent injuries that would have just occurred[;]" (7) Wallace was agitated by the officers' presence at his house and yelled to J.T. while he was handcuffed on the porch that she should tell the officers that "nothing physical occurred[;]" and (8) Clayman saw various items strewn about the trailer and a hammer by the door while he was inside the trailer.

{¶ 30} Although this evidence shows that something likely happened to J.T. in the trailer that day, there is no evidence in the record to support a finding that Wallace was the cause of the harm to J.T. or that he caused harm to her knowingly. Without evidence of these two crucial elements of a domestic violence charge, we cannot say that the remaining evidence shows, beyond a reasonable doubt, that Wallace is guilty of domestic violence. Therefore, we cannot say that the trial court's admission of J.T.'s statements through Clayman's testimony was harmless. Accordingly, Wallace's first assignment of error is well-taken.

### B. Wallace's conviction is supported by sufficient evidence.

{¶ 31} In his second assignment of error, Wallace argues that the trial court erred by denying his Crim.R. 29 motion for acquittal. He contends that "[t]his is a case with no actual witnesses[,]" and the officers' testimony about the "alleged injuries they did not observe . . ." is not enough to support his conviction. The state responds that the

12.

circumstantial evidence it presented, when viewed in its favor, is sufficient to show that Wallace knowingly caused physical harm to J.T.

{¶ 32} A motion for acquittal under Crim.R. 29 challenges the sufficiency of the evidence. *State v. Brinkley*, 2005-Ohio-1507, ¶ 39. The denial of a Crim.R. 29 motion "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

{¶ 33} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). A sufficiency review considers *all* of the evidence at trial—whether properly admitted or not. *State v. Brewer,* 2009-Ohio-593, ¶ 16-20, citing *Lockhart v. Nelson,* 488 U.S. 33, 35, 38, 40-42 (1988). We do not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.* Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

{¶ 34} Wallace was convicted of domestic violence under R.C. 2919.25(A), which requires the state to prove that the defendant knowingly caused physical harm to a family or household member. A defendant acts "knowingly" when, regardless of his purpose, he

13.

is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). "Physical harm" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A person with whom the defendant shares a child is a "family or household member." R.C. 2919.25(F)(1)(b).

{¶ 35} When all of the evidence presented at trial—including the improper testimony about J.T.'s statements—is taken into account, there was sufficient evidence for the jury to convict Wallace of domestic violence. Orzech knew that Wallace and J.T. had children together; Orzech heard Wallace and J.T. fighting; J.T. had a red mark on her face, some swelling, and a swollen lip that appeared to be recent injuries; J.T. told Clayman that she had gotten her injuries because Wallace threw various household items at her, hitting her with a pack of batteries; while Wallace was handcuffed on the porch, he was agitated and yelled to J.T. that she should tell the police nothing physical had happened between them; and Wallace stipulated to a prior domestic violence conviction. Taken together, this shows that J.T. was Wallace's family or household member, Wallace caused her physical harm by throwing batteries at her, and he was properly convicted of a fourth-degree felony because of his prior domestic violence conviction. Thus, Wallace's conviction is supported by sufficient evidence, and his second assignment of error is not well-taken.

14.

## III. Conclusion

**{¶ 36}** Because the trial court violated Wallace's rights under the Confrontation Clause by allowing Clayman to testify to statements that J.T. made, and the error was not harmless beyond a reasonable doubt, the July 20, 2023 judgment of the Erie County Court of Common Pleas is reversed and remanded for a new trial. The state is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

Myron C. Duhart, J.

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.